# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO. 03-05-00430-CV

**Bechtel Corporation; MasTec North America, Inc., d/b/a Wilde Construction; C&S Network Construction and Bechtel Telecommunications, Appellants**

**v.**

**CITGO Products Pipeline Company, Appellee**

## FROM THE DISTRICT COURT OF CALDWELL COUNTY, 22ND JUDICIAL DISTRICT NO. 01-0-213, HONORABLE TODD A. BLOMERTH, JUDGE PRESIDING

## O P I N I O N

We withdraw our opinion dated October 3, 2008; our supplemental opinion dated November 7, 2008; and our judgment dated November 7, 2008; and substitute the following in their place. We overrule CITGO Products Pipeline Company's motion for rehearing.

A work crew employed by MasTec North America, Inc. d/b/a Wilde Construction (MasTec/Wilde) ruptured an underground gasoline pipeline owned and operated by CITGO Products Pipeline Company (CITGO) while excavating for an underground telecommunications line. Approximately 390 barrels of gasoline escaped into the surrounding area before the spill could be contained. CITGO incurred substantial expenses in responding to the spill and remediating contamination to soil and groundwater. CITGO sued MasTec/Wilde; C&S Network Construction,

a MasTec/Wilde affiliate also involved in the project; and Bechtel Corporation and Bechtel Telecommunications (collectively, Bechtel), the construction manager on the project. CITGO's claims were tried to a jury. Based on the verdict and evidence it subsequently heard on attorney's fees, the district court awarded CITGO a total of $1,461,955.80 in actual damages from MasTec/Wilde (which had assumed C&S's liabilities in addition to its own), $115,919.48 from Bechtel, prejudgment interest on these amounts, and $295,357.25 in attorney's fees from MasTec/Wilde. MasTec/Wilde, C&S, and Bechtel have jointly appealed the judgment, bringing fifteen common issues. For the reasons explained herein, we will reverse and render judgment in part, reform the judgment and, as reformed, affirm the judgment in part.

## BACKGROUND

The pipeline rupture occurred in May 1999, while appellants were laying an underground fiber-optic cable for Enron Broadband Services, Inc., as part of Enron Broadband's "Texas Loop Project." Enron Broadband hired MasTec/Wilde to lay the cable. MasTec/Wilde, in turn, subcontracted with C&S to work on the project. At all relevant times, MasTec/Wilde and C&S were each wholly-owned subsidiaries of MasTec, Inc. As their working arrangement was described at trial, MasTec/Wilde operated "rip crews" who would plow or "rip" trenches in the ground in which the cable would be placed, while C&S operated "bore crews" that would drill or bore holes underground as necessary to lay cable beneath obstacles. Enron Broadband also hired Bechtel as its construction manager for the Texas Loop Project. Bechtel's job included supervising the progress of the cable-laying operations.

2

The nature of the work to be performed on the Texas Loop Project implicated the Underground Facility Damage Prevention and Safety Act, commonly known as the Texas "one-call" statute. The current iteration of the one-call statute is codified in chapter 251 of the utilities code. *See generally* Tex. Util. Code Ann. §§ 251.001-.203 (West 2007). At the time this case arose, however, the one-call statute was contained in article 9033 of the revised civil statutes, Act of Apr. 23, 1999, 76th Leg., R.S., ch. 62, § 18.17(a), 1999 Tex. Gen. Laws 392, 392-402 ("Former art. 9033"), and the case was tried, submitted, and briefed on appeal with extensive reference to that version of the statute. Although the two versions are largely identical in substantive respects material to this proceeding, we will refer to the former article 9033 version for clarity.

The one-call statute generally requires that any person intending to "excavate" (as MasTec/Wilde and C&S undisputedly were[1]) to give notice to a "notification center" not earlier than the 14th day before the date excavation is to begin or later than the 48th hour before the time excavation is to begin. Former art. 9033, § 9(a). Such notice shall include (1) the name of the person serving the notice; (2) the "location of the proposed area of excavation," including a street address, if available, or "an accurate description of the excavation area using any available designations such as the closest street, road, or intersection"; (3) the name, address, and telephone number of the excavator or excavator's company; (4) the excavator's "field telephone number," if

---

[1] The one-call act defines "excavate" or "excavation" to mean "to use explosives or a motor, engine, hydraulic or pneumatically powered tool, or other mechanized equipment of any kind and includes auguring, backfilling, boring, compressing, digging, ditching, drilling, dragging, dredging, grading, mechanical probing, plowing-in, pulling-in, ripping, scraping, trenching, and tunneling to remove or otherwise disturb soil to a depth of 16 or more inches." Act of Apr. 23, 1999, 76th Leg., R.S., ch. 62, § 18.17(a), 1999 Tex. Gen. Laws 392, 393 ("Former art. 9033").

available; (5) "the starting date and time and the anticipated completion date of the excavation"; and (6) a statement as to whether explosives will be used. *Id*. § 9(b).[2]

A "notification center" under the one-call statute refers to an entity in which "operators" of "Class A underground facilities"—which include underground gasoline pipelines[3]—must "participate," as a condition of doing business in Texas, by providing the notification center maps, grid locations, or other identifiers indicating the locations of the operator's underground facilities; updates regarding any changes in such information; and the name and telephone number of a contact person or persons. *Id.* § 7(a), (b). The notification center, in turn, is required, within two hours after receiving a notice of intent to excavate, to transmit the information received from the excavator to "each member operator that may have an underground facility in the vicinity of the proposed excavation operation." *Id*. § 8(b), (c).

A C&S employee, Clint Ferguson, had the responsibility as "construction locator" to make the required "one-calls" for both the MasTec/Wilde rip crews and the C&S bore crews working on the Texas Loop Project. A portion of the project, approximately 8.5 miles in length, was to run through southern Caldwell County—the Luling area—along the north side of State Highway 90. Work on this portion of the project commenced in April 1999. Beginning as early as April 12, 1999, Ferguson made a series of one-calls to a notification center in advance of and during

---

[2] A person may deliver this information "by any appropriate method, including the use of electronic means of data transfer," and the notice is considered to have been provided when "the person delivers the required information and a notification center receives that information within the time limits prescribed by this Act." *Id*. § 11.

[3] *See id.* § 2(2).

4

the crews' work in Caldwell County. The notification center, in turn, generated notifications to operators of underground facilities in the area.

East of Luling, the route of the planned Texas Loop Project excavation crossed a gasoline pipeline, known as the CASA Pipeline, that was owned and operated by CITGO. As one of the operators who had underground facilities in the area, CITGO received the notices transmitted by the notification center in response to Ferguson's one-calls. The information transmitted by the notification center reflected that the work was to be performed by "C&S Construction" for "Enron," and provided Clint Ferguson's name and a phone number as the designated contact. The location of the proposed excavation was described in these notices as the entire right-of-way along the north side of Highway 90 running from the Caldwell-Guadalupe County line easterly to the Caldwell-Gonzalez County line.

The one-call statute requires an operator who receives a one-call notice must—generally within 48 hours after the time the excavator gave notice to the notification center of its intent to excavate, or "at a time agreed to by the operator and the excavator"—"mark the approximate location of its underground facilities at or near the site of the proposed excavation if the operator believes that marking the location is necessary." Former art. 9033, § 14(a).[4] The statute also affords an operator the right to be present at an excavation site if it meets certain conditions:

---

[4] The one-call statute has since been amended to require an operator who does not deem marking its facilities "necessary" to give notice of such action to the excavator within 48 hours. Act of May 22, 2001, 77th Leg., R.S., ch. 858, § 2, 2001 Tex. Gen. Laws 1707, 1707-08, *codified at* Tex. Util. Code Ann. § 251.157(d) (West 2007). No such provision was contained in the version of the one-call statute applicable to this case, however.

> To have a representative present during the excavation, the operator shall contact the excavator and advise the excavator of the operator's intent to be present during excavation and confirm the start time of the excavation. If the excavator wants to change the start time, the excavator shall notify the operator to set a mutually agreed-to time to begin the excavation.

*Id.* § 9(c). Importantly, if "[a]n excavator . . . has fully complied with the Act," the act further provides, the excavator "may not be liable for damage to an underground facility that was not marked in accordance with the Act." *Id.* § 14(c).

It is undisputed that, on May 7, 1999, a MasTec/Wilde rip crew struck the CASA Pipeline with a "rip cat,"a piece of machinery, weighing 70,000 to 80,000 pounds and having an 8 to 10 foot blade, used in trenching operations to "rip" or break up ground in advance of a bulldozer or plow. The impact ruptured the pipeline. Although there was fortunately no explosion, approximately 390 barrels of gasoline escaped before the spill could be contained. CITGO was able to recover only about 40 barrels of the gasoline. The escaped gasoline caused contamination to soil and groundwater. In addition to its lost product and pipeline repairs, CITGO incurred substantial expenses in responding to and remediating the spill.

Trial centered largely on whether appellants or CITGO were responsible for rupturing the pipeline and the extent to which CITGO, C&S, and MasTec/Wilde had each complied with their respective obligations under the one-call statute. To summarize, CITGO maintained that its employees and agents had promptly responded to each one-call notification by contacting Ferguson to inquire about the details of his crews' upcoming work. During these conversations, according to CITGO, Ferguson was informed that CITGO intended to have a representative present if his crews excavated near the CASA Pipeline and that Ferguson had agreed that no such work would

6

occur without prior notice to CITGO. It further claimed that in response to a one-call notification it received on the morning of May 7, CITGO's Sam Bentley called Ferguson and obtained assurances that Ferguson's crews would be working several miles to the east of the CASA Pipeline area that day. Under CITGO's theory, appellants breached these understandings or promises and violated the one-call statute when the MasTec/Wilde rip crew excavated in the area later that day without prior notice and without a CITGO representative present.

Appellants, by contrast, argued that CITGO was to blame for the accident because it had failed to locate and mark the CASA Pipeline in compliance with the one-call statute and had even placed stakes at the site that created the misleading impression regarding areas where the crews could safely work. According to appellants, Ferguson's understanding with CITGO was that he would contact CITGO before his crews worked within the staked area. Appellants further contended that the MasTec/Wilde rip crew had hit the CASA Pipeline outside the staked area.

A pivotal event in both side's versions of the underlying facts was an April 22 meeting between CITGO subcontractor Alton Schulle and Ferguson in the general area of the CASA Pipeline crossing. Schulle and Ferguson arranged the meeting to discuss excavation near the pipeline. An understanding of the configuration of the Highway 90 right-of-way and the above-ground features signifying the presence of the pipeline is helpful in understanding the subsequent events. In this area, Highway 90 runs in roughly an east-west direction. A fenceline, located several feet north of the highway, ran roughly parallel to the highway. In the fenceline was a metal pipeline marker, and some fenceposts on either side were topped in white—an indication of a pipeline right-

7

of-way. Near the metal pipeline marker was a vent pipe extending out of the ground. Another vent pipe appeared on the south side of Highway 90, at an angle southeast of the other vent pipe.

During this meeting, Schulle attempted to locate the pipeline with an electronic "line finder." He was unsuccessful. Schulle placed a wooden, flagged stake roughly eight feet south of the vent pipe on the north side of Highway 90 and, later, two additional stakes—one approximately 17 feet to the west of the first stake, and the other 15 and one half feet to the east of the original stake. The parties gave competing accounts regarding what Schulle had intended the stakes to signify. According to Ferguson, after Schulle had attempted unsuccessfully to locate the pipeline with his line-finder, Schulle approximated the pipeline route by standing on the highway and "lining up" the vent pipe on each side of the highway with his arms. Based on this estimation, Ferguson recounted, Schulle placed the middle stake to indicate where he thought the pipeline ran. Ferguson further testified that he asked Schulle to mark a "safety zone" that his crews would know to avoid and outside of which they could work. The pair parted ways after their meeting, Ferguson claimed, with Schulle indicating he would return with a different line-finder and attempt again to locate the pipeline. Later that day, Ferguson recounted, the two additional stakes had appeared at the site. According to Ferguson, although he knew the precise location of the pipeline had not been located, he understood the three stakes to signify that the pipeline was located somewhere within that area and that his crews could work safely outside of it.

Schulle, by contrast, denied that he had ever agreed or purported to mark a "safety zone" where the pipeline actually ran. He claimed that he had placed the stakes solely to call attention to the CASA Pipeline right-of-way because the metal pipeline marker in the fence, as

8

well as the white-topped fenceposts, were obscured by brush.[5] Schulle and other CITGO witnesses claimed that Ferguson had a clear understanding that the CASA Pipeline had not yet been located and that it would be necessary to find the line by carefully digging with a backhoe or by hand to unearth it before the cable project could cross it. Such efforts, CITGO claims it repeatedly emphasized to Ferguson, should have occurred only when its representatives were present. According to CITGO, Ferguson shared that understanding and had agreed that his crews would not dig near the CASA Pipeline without prior notice to CITGO and without a representative present. It claims that, in reliance on this understanding, CITGO did not perceive a need to mark the precise route of the pipeline, as it anticipated that it would work with Ferguson's crews to unearth the line at the appointed time. Ferguson, although not disputing that he had promised to give notice to CITGO before his crews excavated over the pipeline, claimed that this obligation applied only to work his crews would perform within the staked area.

On May 6, Schulle and CITGO's Sam Bennett arranged with Ferguson to meet with Chad Treadwell, the drilling superintendent of the C&S bore crews. Treadwell recounted that the purpose of the meeting was to discuss how the crew was to bore under or cross the CASA Pipeline. He acknowledged that Ferguson had told him that the precise location of the pipeline had not yet been located. During the meeting, Schulle and Bentley tried to find the pipeline with a line-finder, again without success. Ferguson, at Bentley's request, dug a trench with a backhoe in front of the middle stake in an attempt to locate the pipeline. They did not find it. Based on this information,

---

[5] Schulle compared his use of the stakes to "the way you would use a highlighter on a piece of paper" and "was in no way to tell anyone where the pipeline was specifically located."

9

Bentley concluded that the pipeline was located somewhere to the east of the middle stake. He permitted the boring crew to dig in the west part of the staked area in order to bore under a TXDOT gravel or dirt pile to the immediate west. The CITGO agents did not adjust or move the stakes, however. Bentley explained that he did not believe it necessary to readjust the stakes because CITGO had been assured that no excavation would take place at the location without prior notice.

As it turned out, the portion of the CASA Pipeline north of Highway 90 ran mostly to the east of the staked area. From the south, the pipeline passes near the vent pipe south of Highway 90 and crosses at a right angle to the roadway, continues running northward into the highway right-of-way for several feet, then veers at a sharp angle to the northwest. The pipeline continues in a northwesterly direction so as to cross the fenceline some distance to the west of the plane on which it had crossed Highway 90 and from which it bent northwestward.[6] Because of the configuration of the pipeline, all or substantially all of the pipeline segments south of the stakes lay to the east of the staked area.

CITGO presented evidence of how its employees and agents responded to the one-call notifications generated by Ferguson, including copies of the one-call notifications. On virtually all is a stamped form eliciting "Person Contacted," "Date," "By," and "Remarks." Each form is completed by hand. According to the handwritten notations, Ferguson assured CITGO on numerous occasions that his crews would be working in areas other than near the CASA Pipeline and that he would contact CITGO before his crews began work near the line. One notification, dated May 5,

---

[6] Consequently, if, as Ferguson alleged, Schulle had estimated the pipeline route by lining up the two vent pipes, Schulle would have identified the long side of a triangle whose other two sides were formed by the pipeline's actual route.

1999, at 16:30 (4:30 p.m.), contained handwritten notations indicating that CITGO's "Dennis Elly" contacted "Clint" and was advised that "they were about 1 mile west of line." Another notification, dated May 7, at 10:15 a.m., contains handwritten notations indicating that CITGO's Sam Bentley contacted Clint Ferguson that day and was advised: "This work is east of our line in Harwood area. Will not be working near our line today." Harwood is a Caldwell County community located on Highway 90 several miles east of the CASA Pipeline area. Bentley testified that he obtained these assurances during the morning of May 7. Ferguson denied giving such assurances.

Later that same day, at approximately 3:00 p.m., the MasTec/Wilde crew hit the CASA Pipeline with its rip cat. The operator as well as his supervisor, testified that they had assumed the three wooden stakes at the site reflected the actual pipeline route, and that no one had informed them that the pipeline had, in fact, not yet been located. There was also evidence that, consistent with this belief, the operator had attempted to avoid the staked area and begun ripping at or near the eastern stake going eastward. Although the precise location where the rip cat struck the pipeline was disputed, there was evidence that the impact had occurred in an area of the pipeline east of the staked area.

CITGO subsequently sued a number of parties for damages it incurred in connection with the pipeline rupture. It asserted causes of action for negligence, negligence per se, trespass, breach of contract, and promissory estoppel against MasTec/Wilde and C&S. In addition, CITGO asserted causes of action for negligent hiring, negligent retention, and negligent supervision against Bechtel. As to all defendants, CITGO alleged malice and sought exemplary damages.

11

MasTec/Wilde, C&S, and Bechtel raised affirmative defenses, including immunity under the one-call statute.

The district court submitted jury issues regarding negligence against C&S, MasTec/Wilde, Bechtel, and CITGO; promissory estoppel against C&S and MasTec/Wilde; trespass against C&S and MasTec/Wilde; and appellants' affirmative defense of immunity under the one-call statute. Predicated on affirmative findings as to either negligence or trespass as to one or more defendants, the court also submitted whether such conduct had been committed with malice. The jury found that the negligence of all parties had proximately caused the pipeline rupture, and apportioned responsibility 30 percent to MasTec/Wilde, 50 percent to C&S, 10 percent to Bechtel, and 10 percent to CITGO. The jury awarded $1,159,194.75 in past negligence damages and $668,250.00 in future negligence damages. The jury failed to find that either C&S or MasTec/Wilde had committed trespass or that any defendant had acted with malice in committing negligence. As for promissory estoppel, the jury found that CITGO had foreseeably relied to its detriment on a promise by both MasTec/Wilde and C&S and awarded $871,413.99 in past damages and $668,250.00 in future damages. CITGO had requested attorney's fees under its promissory estoppel theory, and the parties subsequently tried the amount of such fees to the district court.

Regarding appellants' claims of immunity under the one-call statute, the district court instructed the jury by quoting pertinent portions of the statute and submitting, over objection, a series of three questions that followed a burden-shifting framework: (1) did MasTec/Wilde and C&S each "give the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute?" (i.e., the one-call notice); (2) if so, "Did CITGO respond in accord with Section 9(c) [regarding the right to be present

12

at the excavation] and 14 [regarding marking its facilities] of the Texas One-Call Statute?"; and (3) if so, did MasTec/Wilde and C&S each "then respond in accord with requirements for excavators as described in Section 9(c) of the Texas One-Call Statute." In the first question, the jury found in the affirmative as to both MasTec/Wilde and C&S. In the second, the jury found in the affirmative. In the third question, the jury found that neither MasTec/Wilde nor C&S had responded in accord with section 9(c).

The district court rendered judgment on the verdict. Because MasTec/Wilde had assumed all of C&S's liabilities, the court imposed judgment against MasTec/Wilde for the damages the jury had awarded against both affiliates. Against MasTec/Wilde, the district court awarded CITGO $927,355.80 in past damages and $534,600.00 in future damages, amounts reflecting the total percentages of responsibility that the jury had imposed against MasTec/Wilde and C&S for negligence (30 percent + 50 percent = 80 percent) applied to the jury's awards of past and future negligence damages. Similarly, the district court awarded CITGO $115,919.48 in past damages and $66,825.00 in future damages from Bechtel, reflecting the 10 percent of negligence responsibility that the jury had apportioned to that party. Further, based on the jury's promissory estoppel findings against MasTec/Wilde and C&S, the district court awarded CITGO $295,357.25 in trial-level attorney's fees, plus a total of another $75,000 in conditional appellate attorney's fees. Finally the court awarded prejudgment interest of $236,629.18 against MasTec/Wilde and $29,577.46 against Bechtel, and assessed court costs against MasTec/Wilde

MasTec, C&S, and Bechtel appealed.

13

**ANALYSIS**

Appellants bring a total of fifteen issues that can be categorized into four groups: (1) issues concerning the affirmative defense of immunity under the one-call statute; (2) an issue challenging the imposition of negligence liability against them; (3) issues contesting the amount of past and future damages awarded in the judgment; and (4) issues attacking the attorney's fee award and the underlying jury findings regarding promissory estoppel.

**One-call statute**

As noted, the one-call statute has provided at all relevant times that "[a]n excavator who has fully complied with this Act may not be liable for damage to an underground facility that was not marked in accordance with this Act." Former art. 9033, § 14(c). The district court submitted the fact issues controlling the application of this defense in Question 12 of the charge. In Question 12, the court instructed the jury as follows:

> You are instructed that Texas Underground Damage Prevention and Safety Act, commonly known as the "Texas One-Call Statute," states as follows:
>
> **SECTION 9: DUTY OF AN EXCAVATOR.**
>
> (a) A person who intends to excavate shall notify a notification center not earlier than the 14th day before the date the excavation is to begin or later than the 48th hour before the time the excavation is to begin, excluding Saturdays, Sundays, and legal holidays. Provided, however, if an excavator makes a Saturday notification, the excavator may begin the excavation the following Tuesday at 11:59 a.m. unless the intervening Monday is a holiday. If the intervening Monday is a holiday, the excavator may begin the excavation the following Wednesday at 11:59 a.m.

14

(b)    The notice required under this section shall include:

   (1)    the name of the person serving the notice;
   (2)    the location of the proposed area of excavation, including;
      (A)    the street address, if available, and the location of the excavation at the street address; or
      (B)    if there is no street address, an accurate description using any available designations such as the closest street, road, or intersection;
   (3)    the name, address, and telephone number of the excavator or the excavator's company;
   (4)    the excavator's field telephone number, if one is available;
   (5)    the starting date and time and the anticipated completion date of excavation; and
   (6)    a statement as to whether explosives will be used.

(c)    To have a representative present during the excavation, the operator shall contact the excavator and advise the excavator of the operator's intent to be present during excavation and confirm the start time of the excavation. If the excavator wants to change the start time, the excavator shall notify the operator to set a mutually agreed-to time to begin the excavation.


## SECTION 14.  DUTY OF OPERATOR TO PERSON EXCAVATING.

(a)    Not later that the 48th hour after the time the excavator give[s] to the notification system notice of intent to excavate, excluding Saturdays, Sundays, and legal holidays, 11:59 a.m. on the Tuesday following a Saturday notification unless the intervening Monday is a holiday, or at a time agreed to by the operator and the excavator, each Class A underground facility owner shall mark the approximate location of its underground facilities at or near the site of the proposed excavation if the operator believes that marking the location is necessary.

(b)    An operator shall refer to the American Public Works Association color coding standards when marking.

(c)    An excavator who has fully complied with this Act may not be liable for damage to an underground facility that was not marked in accordance with the Act.

With the exception of two textual differences that are not material to this case, these instructions tracked verbatim sections 9 and 14 of former article 9033, the version of the one-call statute applicable to this case.[7] *See, e.g.*, *Borneman v. Steak & Ale of Tex.*, 22 S.W.3d 411, 413 (Tex. 2000) ("As a general rule, when a statutory cause of action is submitted, the charge should 'track the language of the provision as closely as possible.'") (quoting *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994)).

Following these instructions, the district court submitted the following question:

**QUESTION NO. 12A**

Did the Defendants listed below give the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute?

Answer "Yes" or "No" as to each:

MasTec/Wilde       _____

C&S       _____

Predicated on an affirmative finding as to either defendant, the jury was instructed to answer the following:

---

[7] The first difference was that the first sentence of section 9(a) omitted a qualifier found in the statute, "Except as provided in sections 12 and 13 of this Act . . . ." Former art. 9033, § 9(a). The second was in section 14(a). The instruction omitted the statutory deadline for the operator to mark their facility applicable when an excavator makes a Saturday notification and the intervening Monday is a holiday—Wednesday at 11:59 a.m. *Id.* § 14(a). It is undisputed that the excavation at issue here occurred on a Friday.

16

**QUESTION NO. 12B**

Did CITGO respond in accord with Section 9(c) and 14 of the Texas One-Call Statute?

Answer "Yes" or "No": 

Predicated on an affirmative answer to 12B, the jury was instructed to answer the following:

**QUESTION NO. 12C**

Did the Defendants listed below then respond in accord with requirements for excavators as described in Section 9(c) of the Texas One-Call Statute?

Answer "Yes" or "No" as to each:

MasTec/Wilde      _____

C&S      _____

The jury found in the affirmative as to both MasTec/Wilde and C&S in Question 12A—that each had "give[n] the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute"—and found in Question 12B that CITGO had "then respond[ed] in accord with Section 9(c) and 14 of the Texas One-Call Statute," but found in Question 12C that neither MasTec/Wilde nor C&S had "then respond[ed] in accord with requirements for excavators as described in Section 9(c) of the Texas One-Call Statute." Based on these findings, the district court did not give effect to appellants' affirmative defense of immunity under the one-call statute.

At trial, appellants objected to Question 12A, 12B, and 12C on the ground that "the special interrogatory structure of the question does not comply with broad form requirements that

17

are currently dictated by the Texas rules and courts." They tendered what they regarded as a substantially correct version of the question containing the following interrogatories:

> Did the Defendants listed below fully comply with the Texas One-Call Statute?
>
> Answer "Yes" or "No" for each of the following:
>
> C&S          _____
>
> MasTec/Wilde _____

Predicated on an affirmative answer as to either defendant, the jury would then have answered the following question:

> Did CITGO mark its pipeline in accordance with the Texas One-Call Statute?
> Answer "Yes" or "No"
> _____ [8]

Appellants bring this complaint forward in their seventh issue on appeal, arguing that the district court abused its discretion in failing to submit the controlling issues regarding immunity under the one-call statute in broad form. They further contend on appeal that Question 12C "did not track the statutory language at all" or "implied to the jury that Defendants were obligated to respond under Section 9(c)." We cannot conclude that the district court abused its discretion.

---

[8] Appellants' proposed submission also contained a "further instruction" that "a joint venture is a legal entity that meets the definition of a 'person' under the Texas One-Call Statute," with a definition of the essential elements of "joint venture." Because we conclude that the district court did not abuse its discretion in submitting Question 12, we need not address whether, as CITGO contends, the proposed "joint venture" instruction was not in substantially correct form.

Our analysis of appellants' contentions relating to the one-call statute turn, in the first instance, on statutory construction. Statutory construction presents a question of law that we review de novo. *See State v. Shumake*, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to give effect to the legislature's intent. *Id.* We seek that intent "first and foremost" in the statutory text. *Lexington Ins. Co. v. Strayhorn*, 209 S.W.3d 83, 85 (Tex. 2006). We consider the words in context, not in isolation. *State v. Gonzalez*, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the text, unless a different meaning is supplied by legislative definition or is apparent from context, or unless such a construction leads to absurd results. *City of Rockwall v. Hughes*, 246 S.W.3d 621, 625-26 (Tex. 2008) (citing *Texas Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004); *Taylor v. Firemen's & Policemen's Civil Serv. Comm'n of City of Lubbock*, 616 S.W.2d 187, 189 (Tex. 1981); *University of Tex. Sw. Med. Ctr. v. Loutzenhiser*, 140 S.W.3d 351, 356 (Tex. 2004)); *see* Tex. Gov't Code Ann. § 311.011 (West 2005) ("[w]ords and phrases shall be read in context and construed according to the rules of grammar and common usage").

Section 14(c) of the one-call statute states that "[a]n excavator who has fully complied with this Act may not be liable for damage to an underground facility that was not marked in accordance with this Act." Former art. 9033, § 14(c). Section 14(c) thus provides immunity from "liability for damage to an underground facility" if an excavator can prove two elements: (1) the "excavator . . . has fully complied with this Act"; and (2) the underground facility "was not marked in accordance with this Act." The term "*fully* complied" plainly denotes complete compliance with the one-call statute in all respects, as contrasted with partial compliance or substantial

19

compliance. *See United States v. Locke*, 471 U.S. 84, 100-01 (1985) (discussing the concept of substantial versus full compliance in the context of statutory deadlines); *CenterPoint Energy Houston Elec., LLC v. Gulf Coast Coalition of Cities*, 252 S.W.3d 1, 15 (Tex. App.—Austin 2008, pet. filed) ("We presume that every word was deliberately chosen and that excluded words were left out on purpose.") (*citing USA Waste Servs. of Houston, Inc. v. Strayhorn*, 150 S.W.3d 491, 494 (Tex. App.—Austin 2004, pet. denied)). Whether or how an excavator "fully complied" with the one-call statute begins with section 9 of the statute, titled "Duty of an excavator." Section 9(a), as discussed, requires an excavator to give at least 48 hours notice to a notification center of its intent to excavate, while section 9(b) specifies the content of such notifications. *Id.* § 9(a), (b). Question 12A appropriately inquired whether MasTec/Wilde and C&S each gave "the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute?"

A one-call notice in compliance with section 9(a) and (b), in turn, triggers an operator's duty under section 14 to "mark the approximate locations of its underground facilities at or near the site of the proposed excavation." *Id.* § 14(a), (b). Section 9(c) also provides that an operator has a right "[t]o have a representative present during the excavation" *if* the operator—presumably in response to the one-call notification it received after the excavator complied with section 9(a) and (b)—"contact[s] the excavator" and (1) advises it of the operator's "intent to be present during excavation" and (2) "confirm[s] the start time of the excavation." *Id.* § 9(c). Conditioned upon an affirmative finding in Question 12A that one-call notification was given, Question 12B submitted both of the operator's duties, inquiring whether CITGO "respond[ed] in accord with Section 9(c) and 14 of the Texas One-Call Statute." By answering "yes" to this

20

conjunctive submission, the jury found that CITGO complied with both the marking requirements of section 14 *and* the conditions for invoking its right to be present at the excavation under section 9(c).

If an operator invokes its right to be present during the excavation by meeting the conditions under section 9(c), as the jury found here, the excavator then has a mandatory duty not to "change the start time" without "notify[ing] the operator to set a mutually agreed to time." *See id.* § 9(c). Whether MasTec/Wilde or C&S each complied with these duties was the focus of Question 12C. That question was conditioned upon an affirmative response in Question 12B—which, again, incorporated an affirmative finding that CITGO had invoked section 9(c)—and inquired whether each "then respond[ed] in accord with requirements for excavators as described in Section 9(c) of the Texas One-Call Statute."

The burden-shifting, conditioned sequence that the district court employed in Question 12 generally tracked the statutory framework and submitted the fact issues whose resolution controlled whether MasTec/Wilde and C&S were entitled to immunity from liability under the one-call statute in this case. Question 12 did deviate from the statute, however, in its conditioning of Question 12C (MasTec/Wilde and C&S's compliance with section 9(c)) on a conjunctive finding in Question 12B that incorporated findings that CITGO complied with *both* section 9(c) *and* section 14. It is CITGO's compliance with section 9(c) that triggered MasTec/Wilde and C&S's duties under section 9(c), regardless whether CITGO also complied with section 14. Although CITGO's compliance with section 14 went to another element of appellants' immunity defense, it did not control whether appellants' duties arose under section 9(c).

21

Question 12C thus would have more closely tracked the one-call statute if it had been predicated solely upon a finding that CITGO had complied with section 9(c).

Appellants emphasize this feature of Question 12 in their motion for rehearing. However, their objection at trial was that "the special interrogatory structure of the question does not comply with broad form requirements that are currently dictated by the Texas rules and courts." Appellants tendered a proposed submission with a single broad-form question regarding MasTec/Wilde and C&S's compliance with the one-call statute—"Did the Defendants listed below fully comply with the Texas One-Call Statute?"—followed by an issue inquiring whether CITGO marked its pipeline as required by section 14. The district court did not abuse its discretion in refusing to submit the controlling issues in the broad-form manner appellants proposed.

Although trial courts must submit fact issues to the jury in broad form "whenever feasible," Tex. R. Civ. P. 277, "'it is not always practicable to submit every issue in a case broadly,' and broad-form submissions cannot be used to broaden the harmless error rule to deny a party the correct charge for which it otherwise would be entitled." *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 230 (Tex. 2005) (quoting *Harris Co. v. Smith*, 96 S.W.3d 230, 235 (Tex. 2002)). Here, broad-form submission as proposed by appellants was not practicable for two reasons. First, appellants' proposal omitted any issue or instruction for the jury to determine whether CITGO had complied with its duties under section 9(c) to notify appellants that it desired to be present during the excavation. CITGO had the burden of proving and obtaining a finding that it had complied with section 9(c) before appellants would be required to prove that they complied with their duties under section 9(c). CITGO would have waived this issue if it failed to obtain that finding. *See* Tex. R.

22

Civ. P. 279. As discussed below, there was legally sufficient evidence that CITGO complied with section 9(c), and it was entitled to have this issue submitted. *See* Tex. R. Civ. P. 278.

Second, even if the proposed submission included proper instructions regarding CITGO's compliance with section 9(c), appellants' proposed issue as to whether C&S and MasTec/Wilde "fully complied" with the one-call statute would have subsumed three issues: (1) whether appellants complied with section 9(a) and (b); (2) whether CITGO complied with section 9(c), so as to give rise to appellants' duties under that provision; and (3) whether appellants complied with section 9(c). An affirmative finding on such an issue would leave an appellate court unable to determine whether the jury found that (1) appellants complied with sections 9(a) and (b) and CITGO did not comply with section 9(c) so as to give rise to appellants' duties under that provision, or (2) appellants complied with sections 9(a) and (b), CITGO complied with section 9(c), and appellants complied with section 9(c). At time of trial, the district court had little, if any, case law guidance regarding the nature of the duties imposed by section 9(c) on either CITGO or appellants under the present facts, and there was room for debate regarding these issues.[9] Appellants' proposed broad-form submission thus presented a risk of commingling potentially valid and invalid theories. *See Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). Under these circumstances, the district court did not abuse its discretion in rejecting a broad-form approach.

---

[9] This is illustrated by the amicus curiae brief filed by the National Utility Contractor's Association, discussed *infra*.

Furthermore, we fail to see any harm to appellants from the form of Question 12 as submitted. The failure to submit a question in broad form does not necessarily constitute harmful error if the charge submits the controlling fact issues and incorporates correct legal standards. *See H.E. Butt Grocery Co. v. Warner*, 845 S.W.2d 258, 259-60 (Tex. 1992). Question 12 submitted to the jury the factual issues controlling appellants' immunity under the one-call statute in this case—whether (1) MasTec/Wilde and C&S complied with sections 9(a) and (b); (2) whether CITGO complied with section 9(c) so as to give rise to appellants' duties under that provision, and whether MasTec/Wilde and C&S complied with those duties; and (3) whether CITGO complied with section 14. Question 12 also incorporated the correct substantive legal standards governing these issues, with the exception of predicating Question 12C on affirmative findings in 12B that CITGO had complied with *both* section 9(c) *and* section 14. Appellants were not harmed by this conditioning instruction, however, because the jury—rightly or wrongly—reached and answered Question 12C anyway. This was to appellants' benefit. Because the jury found in Question 12B that CITGO had complied with section 9(c) so as to invoke appellants' duties under that provision, appellants could prevail on their immunity defense only if they obtained favorable findings in Question 12C that MasTec/Wilde and C&S had complied with section 9(c)—otherwise, appellants would not have established that they "fully complied' with the one-call statute. Although the jury ultimately made findings in Question 12C adverse to appellants, appellants would have waived their immunity defense altogether if they had failed to obtain those findings. *See* Tex. R. Civ. P. 279. We overrule appellants' seventh issue.

In their fifth issue, appellants argue that the district court erred in failing to disregard the jury's answers to Questions 12B and 12C and render judgment that CITGO take nothing. Appellants argue principally that the evidence conclusively establishes that they complied with the notification requirements of section 9*(a)* and *(b)* and that there is legally and factually insufficient evidence that CITGO complied with section *14* by properly marking the CASA Pipeline. Again, Question 12B submitted whether CITGO had complied with its duties under both section 9(c) *and* section 14. By finding in the affirmative, the jury found that CITGO had complied with both sets of duties. It is not clear that appellants are challenging the evidence supporting the jury's other finding in Question 12B that CITGO complied with section 9*(c)* so as to give rise to MasTec/Wilde and C&S's duties under that provision. To the extent appellants are challenging the jury's finding regarding CITGO's compliance with section 9(c), we conclude there is legally and factually sufficient evidence to support it.

When a party challenges the legal sufficiency of the evidence supporting an issue on which the opposing party had the burden of proof, the party must demonstrate: (a) the complete absence of a vital fact; (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; or (d) the evidence establishes conclusively the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal sufficiency review of the evidence, a court must consider all of the evidence in the light most favorable to the fact finding and indulge every reasonable inference that would support it. *City of Keller*, 168 S.W.3d at 822.

25

When reviewing a challenge to the factual sufficiency of the evidence supporting a vital fact that, we must consider, weigh, and examine all of the evidence in the record, both supporting and against the finding, to decide whether the verdict should be set aside. *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989); *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986). When a party attacks the factual sufficiency of an adverse finding on an issue on which the opposing party has the burden of proof, we should set aside the verdict only if the evidence supporting the jury finding is so weak as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

To prove that it had complied with section 9(c), CITGO presented evidence that, in response to one-call notifications and in a face-to-face meeting, it had repeatedly informed Clint Ferguson of its intent to be present at any excavation near the CASA Pipeline and that Ferguson and CITGO had an ongoing understanding that his crews would not excavate near the CASA Pipeline without prior notice and a CITGO representative present. Further, in the context of this understanding, CITGO's Sam Bennett testified that he responded to a one-call notification during the morning of the accident by calling Ferguson and obtaining Ferguson's assurances that his crews would be working several miles away from the pipeline that day. In terms of section 9(c), CITGO had contacted Ferguson, informed Ferguson of its intent to be present when his crews were excavating near the CASA Pipeline, and confirmed that there would be *no* "start time" for such excavation that day.[10] Although Ferguson disputed Bennett's version of this conversation, the jury

---

[10] In an amicus curiae brief, the National Utility Contractor's Association argues that "in order to establish compliance with the statute, Citgo had to prove that it advised Appellants of its intent to be present during the excavation that actually occurred and that Citgo confirmed the start

26

could have reasonably credited Bennett's account, and it was the jury's province to resolve the conflict in the manner it did. *See City of Keller*, 168 S.W.3d at 819, 822 (we may not substitute our judgment for the jury's, and we must defer to the jury's determinations of the credibility of the witnesses, the weight to be given the testimony, and the resolution of evidentiary conflicts.) The evidence was legally and factually sufficient to support the jury's finding in Question 12B that CITGO had complied with section 9(c).

In light of the jury's finding that CITGO had complied with section 9(c), appellants would not have "fully complied" with the one-call statute unless they also complied with their duties under section 9(c). Question 12C submitted whether MasTec/Wilde or C&S "then respond[ed] in accord with requirements for excavators as described in Section 9(c) of the Texas One-Call Statute."

---

time of that excavation" and that "[o]nly if Citgo complied with these requirements and there was a confirmed start time, would Appellants have had a duty to notify Citgo that they wanted to change the start time and reach an agreement as to when to begin excavation." We generally agree that the burden is initially upon the operator to comply with the requirements of section 9(c) before any duties arise under it on the part of the excavator. As we have explained, the district court correctly placed this burden in the jury charge. The Association further urges that "there is no evidence or insufficient evidence that Citgo ever made a request to be present during the excavation *that actually took place near the Luling site* or that Citgo complied with its obligation to 'confirm the start time of the excavation.'" (Emphasis added). The Association's apparent premise is that an operator's confirmation that *no* excavation will be occurring at a location on a particular day does not suffice to "confirm the start time" of an excavation. Similarly, it suggests that if the excavator subsequently reneges and excavates there anyway without informing the operator, the operator will have failed to advise the excavator of its intent to be present "during the excavation that actually took place" despite having been assured that the excavation would not be occurring at all. To the contrary, we conclude from the text and structure of section 9(c) that an operator would necessarily "confirm the start time" of an excavation if it confirmed that the excavator would start *no* excavation at a particular location on a particular day, to the same extent as if the excavator provided a time at which it actually would start excavating. In either case, if the excavator subsequently decided to deviate from that understanding, section 9(c) would require it to "notify the operator to set a mutually agreed-to time."

27

Appellants had the burden of proof on these issues. When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it has the burden of proof, that party must demonstrate on appeal that the evidence conclusively established, as a matter of law, all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001). When a party attacks the factual sufficiency of an adverse finding on an issue on which he has the burden of proof, he must demonstrate on appeal that the adverse finding is against the great weight and preponderance of the evidence. *Id.* The evidence is legally and factually sufficient, if not undisputed, that CITGO was never notified that a MasTec/Wilde rip crew would, contrary to Ferguson's statements, be excavating near the pipeline after all. Appellant do not dispute that this evidence supports the jury's findings in 12C beyond asserting that "the jury's answer to 12C should be disregarded " because "[t]hough the jury found that Defendants failed to notify the pipeline operator of the excavation start time, the record shows Defendants gave numerous notifications within the time frame required by statute." In support, appellants cite to the copies of the one-call notifications in evidence, which, it emphasizes, "Citgo conceded that it received." Although copies of the one-call notifications may be probative of whether MasTec/Wilde or C&S complied with the notification requirements of section 9(a) or (b), so as to support the jury's findings in Question 12A, the jury's finding in 12C instead turned on the nature of the communications between CITGO and Ferguson *after* CITGO's receipt of Ferguson's one-call notifications.

Appellants also argue that we must disregard the jury's findings in Question 12C because (1) the evidence is legally and factually sufficient to support the jury's finding in Question 12B that CITGO complied with section 14; and (2) Question 12C was predicated on the

28

jury's conjunctive finding in 12B that CITGO complied with both section 9(c) *and* section 14. Even assuming these contentions to be valid, however, the remaining jury findings would still support the judgment, for reasons we have previously suggested. Because the jury found in Question 12B that CITGO had complied with section 9(c) so as to invoke appellants' duties under that provision, appellants could not prevail on their immunity defense—i.e., that they "fully complied" with the one-call statute—unless they obtained findings in Question 12C that they complied with section 9(c). Consequently, if the jury's adverse findings in Question 12C were disregarded, this would not aid appellants, but would instead result in the waiver of their immunity defense. *See* Tex. R. Civ. P. 279. Alternatively, because factually sufficient evidence supports them, findings that MasTec/Wilde and C&S failed to comply with section 9(c) would be deemed in support of the judgment. *See id.* We overrule appellants' fifth issue.[11]

Finally, in their sixth issue, appellants urge that CITGO's recovery should be barred as a matter of "public policy" because, they again urge, CITCO failed to mark the CASA Pipeline in compliance with section 14 of the one-call statute. Appellants invoke common-law concepts that have been applied to bar recovery under an insurance policy where the covered loss was caused by the policy beneficiary's own intentional conduct. *See Norman v. State Farm Fire & Cas. Co.*,

---

[11] CITGO brings a cross-point in which it contends the evidence is legally and factually sufficient to support the jury's findings in Question 12A that both MasTec/Wilde and C&S gave "the notice required by Section 9(a) and 9(b) of the Texas One-Call Statute." Specifically, CITGO argues that there is no evidence that anyone other than Clint Ferguson, a C&S employee, made one-call notifications in connection with the Texas Loop Project work and that these calls by C&S did not suffice when the "excavator" who damaged its pipeline was MasTec/Wilde. Because we have overruled appellants' challenge to the jury findings that support the judgment regarding immunity, we need not reach CITGO's cross-point.

29

804 F.2d 1365, 1366 (5th Cir. 1986). Equating CITGO's alleged failure to mark the CASA Pipeline as required by section 14 to such conduct as arson, appellants reason that CITGO should similarly be barred from "benefitting from its own wrongdoing" by recovering damages from the pipeline rupture under negligence and promissory estoppel theories. Appellants cite no authority for extending the concept of *Norman* in this manner, and we are aware of none. We also observe that Texas law already accounts for the type of "wrongdoing" of which appellants complain through proportionate responsibility. Here, the jury attributed ten percent of the negligence that proximately caused the pipeline rupture to CITGO, and reduced its recovery accordingly.

We further observe that giving effect to the common-law "public policy" limitations on which appellants rely would yield a result inconsistent with the legislative public policy judgments reflected in the one-call statute. The legislature—the principal arbiter of public policy under our tripartite system of government—has not seen fit to provide excavators immunity based solely on the failure of an operator to mark its underground facilities. Instead, the excavator must also "fully comply" with the statute. *See* former art. 9033, § 14(c). The net effect of appellants' analysis would be to judicially eliminate or circumvent one of the two statutory elements of one-call act immunity. Finding no support for such a holding in either the one-call statute or Texas common law, we overrule appellants' sixth issue.

**Negligence liability**

In their fourth issue, appellants contend that the jury's apportionment of fault under the negligence findings was against the great weight and preponderance of the evidence and was manifestly unjust. As discussed, the jury apportioned responsibility 50 percent to C&S, 30 percent

30

to MasTec/Wilde, 10 percent to Bechtel, and 10 percent to CITGO. Appellants urge that "the great weight and preponderance of the evidence establishes that CITGO was at least 51% at fault," a percentage that would bar CITGO from recovering in negligence. *See* Tex. Civ. Prac. & Rem. Code § 33.001 (West 2008).

If a jury's verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust, we must reverse the judgment. *See In re King's Estate*, 244 S.W.2d 660, 661 (Tex. 1951). In determining whether a finding was against the great weight and preponderance of the evidence, the court of appeals must consider and weigh all of the evidence, and can set aside a finding only if the evidence is so weak that it is clearly wrong and unjust. *Dow Chem. Co.*, 46 S.W.3d at 241. Appellants emphasize evidence that CITGO received one-call notifications regarding the ongoing Texas Loop Project excavation, that CITGO never located or marked the actual location of the CASA Pipeline, that Schulle placed and left in place stakes that created a misleading impression regarding the pipeline's location, and that CITGO and not appellants had access to the maps and other information from which the pipeline's actual location could have been determined. Indeed, CITGO does not challenge the jury's finding that its was contributorily negligent.

However, the jury also heard evidence CITGO and Ferguson had an understanding that Ferguson's crews would not excavate near the CASA Pipeline without prior notice to CITGO and CITGO's representatives being present, a factor that the jury reasonably could have considered in drawing inferences from the acts or alleged omissions of CITGO personnel that appellants

31

attack.[12] There was also evidence that both Ferguson and Bechtel employees had been informed that CITGO had not yet located the pipeline's precise location. Nonetheless, both the rip cat operator and his supervisor testified that they had not been informed the pipeline had not been located. The jury also heard evidence of a near-miss with another underground facility on May 6 that the jury could reasonably have concluded was caused by similar communication breakdowns between Ferguson and his crews. We cannot conclude that the jury's failure to allocate at least 51 percent of fault to CITGO is against the great weight and preponderance of the evidence and is manifestly unjust. *See Rosell v. Central W. Motor Stages, Inc.*, 89 S.W.3d 643, 659-60 (Tex. App.—Dallas 2002, pet. denied) (the determination of negligent parties' proportionate responsibility is a matter within the jury's sound discretion).

**Negligence damages**

*"Tulsa overhead"*

In their third issue, appellants attack the jury's award of past negligence damages on the basis that there is legally and factually insufficient evidence to support the full amount of that award. At trial, CITGO presented spreadsheets, backup documentation, and testimony from a safety environmental manager, Kenny Holtgreve, indicating that CITGO had incurred a total of $1,159,194 in expenses from the pipeline rupture and gasoline spill until date of trial. The jury ultimately awarded this entire amount as past negligence damages.

---

[12] For example, Bentley testified that he did not believe it necessary to readjust the stakes after determining on May 6 that pipeline lay to the east of the middle stake because CITGO had been assured that no excavation would take place at the location without prior notice.

32

CITGO's calculations presented to the jury included roughly $80,000 it claimed in emergency response costs, $766,000 in remediation costs, $10,000 in lost product, and $15,000 in payments to the adjoining landowner to gain access to the property. The remaining amount—$287,780.76—was a figure intended to reflect the value of employee time, equipment, materials, and other overhead that CITGO had to divert from normal business operations when responding to the large gasoline spill. It is only the latter component of past negligence damages—which the parties respectively term "project management expenses" or "Tulsa overhead"[13]—that appellants challenge.

Holtgreve testified regarding the bases for CITGO's claim for $287,780.76 in "Tulsa overhead." He testified that CITGO incurred significant additional internal costs when having to divert employees and company resources from normal business operations to respond to the spill. Holtgreve, for example, observed that "[o]ne hundred percent of my time" was devoted to the project in the spill's immediate aftermath. He added that "people in the operations area in the field," such as "Sam Bentley and his people" were involved in the project, as well as "accounting people who would have to keep track of the invoices," "administrative people who would get the invoices to process them," and "other managers who would manage, oversee what we did." As Holtgreve put it, "[i]f the person's time is allocated to do this project instead of his normal job, this is time lost by Citgo. Therefore, that is money that Citgo has lost because of the event." Holtgreve further noted that the work required increased use of CITGO telephones and other equipment. To reflect the value

---

[13] This is the term CITGO uses in its spreadsheet to identify this category of expenses.

33

of these lost company resources, Holtgreve explained, CITGO imposed a percentage surcharge or mark-up in the same manner that it did when performing projects, such as relocating pipelines, for a third party.

Holtgreve explained that on such projects, CITGO would ordinarily charge a management fee of 34 percent that "covers the staff type of functions, the accounting functions, the legal functions, the human resource functions, management functions that are not directly associated to Citgo, because Citgo works for Citgo and we are not in the business of doing projects for other companies." Holtgreve opined that such fees were "a common practice in the industry." To approximate the value of its employees' time and overhead expended in the spill response and remediation, CITGO, essentially treating the gasoline spill as if it was a project being performed for a third party, multiplied those costs by 34 percent, yielding the $287,780.76 figure.

Appellants argue that there is legally and factually insufficient evidence that CITGO incurred $287,780.76 in lost employee time and resources. They point out that CITGO did not attempt to quantify or prove the actual amount or value of its lost overhead even though Holtgreve acknowledged that CITGO's accounting department could have tracked those figures. As for the basis of the 34 percent mark-up, Holtgreve conceded that he had no personal knowledge regarding how that percentage figure had been derived, explaining only that "[i]t's a number that [CITGO] had generated in the past based off of some study that [it] had done somewhere in the past" and "was associated with the projects when I started dealing with them." CITGO did not elaborate further regarding the origins of the "Tulsa overhead."

CITGO responds that there was sufficient evidence that CITGO incurred substantial lost employee time and resources when responding to the pipeline rupture. It also suggests that appellants waived any complaint regarding the origins of the "Tulsa overhead" because they did not preserve objections to the admission of Holtgreve's testimony or the submission of a broad-form question on negligence damages. Question 3 of the charge asked: "What sum of money, if paid not in cash, would fairly and reasonably compensate CITGO for the damages incurred in the past resulting from the rupture of the CASA Pipeline." The jury was instructed to consider the reasonable costs in Caldwell County, Texas (1) "to restore the CASA Pipeline to the condition it was in immediately before the occurrence in question" and (2) "to respond to and remediate the spill," including "reasonable and necessary clean-up costs and monitoring expenses." Because Holtgreve's testimony regarding lost employee time and the 34 percent mark-up was in evidence and the charge permitted the jury to consider it, CITGO reasons, appellants cannot now complain that the jury did so.

In this regard, both parties emphasize that appellants objected to and obtained an instruction in the past promissory estoppel damages question, "Do not include Tulsa overhead." In response to appellants' objection, the district court stated that it "didn't hear any evidence" of "what the 34 percent was" or how this fee CITGO charged to third parties was probative of damages CITGO incurred in connection with the spill. However, appellants did not request a similar instruction in the otherwise-parallel question for past negligence damages. As it turned out, the jury, while awarding $1,159,194.75 in past negligence damages, awarded only $871,413.99 in past

promissory estoppel damages—a difference of $287,780.76, corresponding precisely to the amount of "Tulsa overhead."

On this record, sufficient evidence would support the jury's award of $1,159,194.75 in past negligence damages only if there was sufficient evidence that CITGO incurred at least $287,780.76 in "Tulsa overhead." The evidence supports no more than speculation as to that fact. Although Holtgreve did allude generally to "people in the operations area in the field," "accounting people," "administrative people," and "other managers" having to devote all of their time to the project for some unspecified period after the accident, he provided no basis to quantify the value of that time, such as salaries and the like, other than the 34 percent mark-up that CITGO used on third-party projects. CITGO's methodology in determining that percentage was never explained. Nor does CITGO refer us to any other evidence in the record from which the jury reasonably could have inferred that the company had incurred at least $287,780.76 in lost employee time or overhead in connection with the pipeline rupture. Consequently, the evidence is legally insufficient to support the jury's award of the full amount of $1,159,194.75 in past negligence damages.

Appellants do not dispute, however, that legally and factually sufficient evidence supports the award of the other components of past negligence damages, which total $871,413.99. Where, as here, we conclude that there is insufficient evidence to support the full amount of a damages award but sufficient evidence to support a lesser award, we may suggest a remittitur. *See Spring Windows Fashions Div., Inc. v. The Blind Maker*, 184 S.W.3d 840, 889-90 (Tex. App.—Austin 2006, pet. granted, remanded by agr.); Tex. R. App. P. 46.3. The party prevailing in the trial court must be given the option of accepting the remittitur or having the case

remanded for a new trial. *Spring Windows*, 184 S.W.3d at 889-90. Accordingly, in our opinion on original submission, we suggested a remittitur of $287,780.76, the difference between the jury's award of $1,159,194.75 in past negligence damages and the amount of such damages that the evidence supports.

In response to our suggestion of remittitur, CITGO filed with the district clerk a remittitur of $287,780.76 of the past negligence damages awarded in the district court's judgment. Accordingly, we reform this portion of the district court's judgment to award CITGO $871,413.99 in past negligence damages instead of $1,159,194.75. Similarly, as we have overruled appellants' challenges to the portions of the district court's judgment apportioning 80 percent responsibility to MasTec for CITGO's negligence damages and 10 percent responsibility to Bechtel, we reform the district court's judgment to award CITGO $697,131.19 in past negligence damages from MasTec rather than $927,355.80, and $87,141.40 in past negligence damages from Bechtel rather than $115,919.48. We likewise reform the district court's award of prejudgment interest on these amounts to award CITGO $178,081.64 from MasTec and $22,260.21 from Bechtel.

### *Future damages*

In their second issue, appellants argue that CITGO cannot recover future damages because the testimony of CITGO's damages expert, David Sweeten, was unreliable and should have been excluded.[14] Appellants brought a pretrial motion to exclude Sweeten's testimony as unreliable

---

[14] Appellants asserted this challenge against the jury's findings regarding both future negligence and future promissory estoppel damages. As to each, the jury awarded the sum of $668,250.00.

37

on grounds that there was no basis for an assumption that the "plume" of benzene and MTBE[15] contamination from the gasoline that had escaped the ruptured CASA Pipeline had extended into the surrounding area beyond Plum Creek, an area waterway.  If Sweeten's testimony had been properly excluded, appellants contend, there is no evidence of future damages.

A trial court's decision to admit or exclude expert testimony is reviewed for an abuse of discretion.  *Helena Chem. Co. v. Wilkins*, 47 S.W.3d 486, 499 (Tex. 2001).  "The test for abuse of discretion is whether the trial court acted without reference to any guiding rules or principles." *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 558 (Tex. 1995).  If a party opposes and objects to the admission of expert testimony, the proponent bears the burden of demonstrating its admissibility.  *Robinson*, 923 S.W.2d at 557.

Expert testimony is admissible if (1) the expert is qualified, and (2) the testimony is relevant and based on a reliable foundation.  *Wilkins*, 47 S.W.3d at 499; *Robinson*, 923 S.W.2d at 556.  Scientific testimony is unreliable if it is not grounded "in the methods and procedures of science," and amounts to no more than a "subjective belief or unsupported speculation." *Robinson*, 923 S.W.2d at 557 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993)). Expert testimony is also unreliable if "there is simply too great an analytical gap between the data and the opinion proffered." *Gammill v. Jack Williams Chevrolet*, 972 S.W.2d 713, 727 (Tex. 1998) (quoting *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)).

Factors used by courts to determine whether expert testimony is reliable include:

---

[15]  MTBE stands for methyl-tertiary-butyl-ether, a common additive to gasoline.

1. the extent to which the theory has been or can be tested;

2. the extent to which the technique relies upon the subjective interpretation of the expert;

3. whether the theory has been subjected to peer review and/or publication;

4. the technique's potential rate of error;

5. whether the underlying theory or technique has been generally accepted as valid by the relevant scientific community; and

6. the non-judicial uses which have been made of the theory or technique.

*Robinson*, 923 S.W.2d at 557. These factors are non-exclusive and flexible. *Id.*

Sweeten testified concerning two estimates of future clean-up costs that he had prepared. In his first estimate, which he had prepared in early 2004, Sweeten calculated total future costs as $668,250.00. In his second estimate, which he prepared in November 2004, Sweeten revised these calculations in light of intervening developments to yield a total of $1,270,000.00 in estimated future clean-up costs. The focus of appellants' challenge is Sweeten's assumption in his second cost estimate that contamination had extended from the rupture site beyond Plum Creek. Appellants attack this assumption in light of Sweeten's admission that he had not completed a delineation of the plume beyond the creek.

The jury ultimately awarded $668,250.00 in future damages under both CITGO's negligence and promissory estoppel theories, an amount corresponding precisely to Sweeten's first cost estimate. Consequently, if Sweeten's testimony regarding his first cost estimate is relevant, is reliable, and was properly admitted, that evidence alone could support the jury's future damages

39

award. We conclude that the district court did not abuse its discretion in admitting Sweeten's testimony regarding his first cost estimate.

Sweeten's first cost estimate was based on an area on the spill side of Plum Creek, on which well testing had shown that MTBE and benzene were above acceptable TCEQ-approved levels. The data retrieved from these temporary wells included points within a specific area between the release site and Plum Creek and exhibited levels of both MTBE and benzene that exceeded the TCEQ acceptable levels. These data points created a circular area of contamination from which Sweeten calculated the estimated clean-up costs. Applying his experience to these data points, Sweeten testified to future environmental clean-up costs totaling $668,250.00.

According to the report prepared by Sweeten as well as his accompanying testimony, some of the factors he considered in arriving at the $668,250.00 estimate were:

- Groundwater monitoring and reporting: collecting semi-annual groundwater samples from the permanent monitoring wells, as required by TCEQ for the life of the clean-up project

- Laboratory costs: costs incurred from submission of the gathered samples to a lab for analysis

- Pilot testing, aquifer pump test, and remedial design: tests to determine methods of running short-scale or short-duration tests to determine the appropriate technology for interim corrective action, as required by TCEQ

- Submission of APAR (Affected Property Assessment Report) or risk assessment: compilation of all collected data

- Prepare response action plan (RAP): preparation of a report, as required by the TCEQ

- Prepare site-specific discharge permit: costs incurred in obtaining a permit to pump the water out so that contaminated water does not reach Plum Creek

- Remedial system design, capital equipment and construction: based on the data gathered, a report setting out the response action plan, including capital costs for equipment to be used

- General project management regulatory interface: managing the tasks and coordinating the people and equipment, including communications with TCEQ

Sweeten testified that he then took the above line items and projected them out over the next few years, to the extent that they were ongoing events. Sweeten also testified that he had prepared similar cost estimates for CITGO on another pipeline project and on other projects for other clients and that, based on this experience, he was generally familiar with how much these clean-up procedures cost.

Although there had not yet been a "complete delineation" such that CITGO did not yet know the "full extent" of the problem, some testing and delineation activities had been completed—notably, those in the area of the concentration circles on which Sweeten's first cost estimate was based. Even assuming that appellants are correct in their assertion that there was no evidence how far the contamination extended, there was at least evidence that the area contained in the concentration circles—and the area on which Sweeten's first cost estimate was based—was contaminated according to TCEQ standards. Contrary to appellants' assertion, Sweeten agreed that he needed more information to determine a final remedial technology, not that he needed more information to create a reliable cost estimate as to the designated area. With the data points available to Sweeten, he was able to create a reliable initial cost estimate, which projected clean-up costs to

41

be $668,250.00. Although the full extent of the contamination may have been unknown at the time, the figure of $668,250.00 was based on known, objective data points. We, therefore, conclude that, based on Sweeten's experience and the known data points, his testimony with respect to the initial cost estimate was reliable, and the district court acted within its discretion in admitting it. *See Gammill*, 972 S.W.2d at 726 ("Experience alone may provide a sufficient basis for an expert's testimony"). Accordingly, we overrule appellants' second issue.

**Attorney's fees**

In their remaining nine issues, appellants challenge the district court's award of $295,357.25 in trial-level attorney's fees and another $75,000 in conditional appellate attorney's fees. This award was based on the jury's favorable findings regarding CITGO's promissory estoppel theory of recovery, section 38.001(8) of the civil practice and remedies code, *see* Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (West 2008) (authorizing attorney's fees for claims for "an oral or written contract"), and the evidence that the district court heard regarding the amount of such fees. Appellants assert essentially four types of challenges to the attorney's fee award.

First, appellants bring a number of issues attacking CITGO's right to recover under a promissory estoppel theory. Appellants argue that CITGO presented no evidence of any damages compensable under a promissory estoppel theory,[16] that the evidence is legally and factually insufficient to support the jury's finding that CITGO reasonably relied on any promise to its

---

[16] Appellants' thirteenth issue.

detriment,[17] that CITGO's "promissory estoppel" claim "sounded in tort,"[18] and that CITGO's recovery in negligence eliminates any "injustice" that would justify the application of the promissory estoppel doctrine.[19] *See, e.g.*, *Trammel Crow Co. No. 60 v. William Jefferson Harkinson and Jeff Harkinson Investments, Inc.*, 944 S.W.2d 631, 636 (Tex. 1997) (promissory estoppel "may apply. . . if injustice can be avoided only by enforcement of the promise"). Appellants also urge that the jury's contributory negligence finding against CITGO bars its recovery under promissory estoppel, as a matter of law,[20] and, relatedly, that the district court abused its discretion in refusing to submit an "unclean hands" instruction to the jury.[21]

In the alternative, in their eighth issue, appellants argue that a promissory estoppel claim is not a claim for "an oral or written contract" that can support an award of attorney's fees under section 38.001(8) of the civil practice and remedies code.[22] In the further alternative, in their

[17] Issue twelve.

[18] Issue nine. In fact, CITGO had sought submission of a negligent misrepresentation theory, to which appellants objected on the ground that it had not been pled. The district court refused the submission, and CITGO does not complain of that ruling on appeal.

[19] Issue eleven.

[20] Issue ten.

[21] Issue fourteen.

[22] As appellants emphasize, Texas courts currently are split on that question. *Compare Doctors Hosp. 1997, L.P. v. Sambuca Houston, L.P.*, 154 S.W.3d 634, 635-38 (Tex. App.—Houston [14th Dist.] 2004, pet. abated) (holding that attorney's fees are not recoverable under section 38.001(8) for a promissory estoppel claim because such claims presuppose *no* "oral or written contract") (quoting *Subaru of Am., Inc. v. David McDavid Nissan, Inc.*, 84 S.W.3d 212, 226 (Tex. 2002) ("promissory estoppel doctrine presumes no contract exists")), *with Preload Tech., Inc. v. A.B. & J. Constr. Co.*, 696 F.2d 1080, 1094-95 (5th Cir. 1983) (Texas law) (upholding award of attorney's fees for promissory estoppel claim enforcing a promise that the court compared to

43

first issue, appellants urge that CITGO cannot "mix and match" recovery of actual damages based on its negligence theory and attorney's fees under its promissory estoppel theory, but must be required to elect to recover under only one of the theories. *See JHC Ventures, L.P. v. Fast Trucking, Inc.*, 94 S.W.3d 762, 774 (Tex. App.—San Antonio 2002, no pet.).[23] Finally, in their fifteenth issue, appellants complain that CITGO failed to segregate its attorney's fees among valid and invalid grounds of recovery.

We agree with appellants that CITGO cannot recover under a promissory estoppel theory because CITGO presented no evidence of the types of damages that are compensable under such a theory. As it has been recognized by the Texas Supreme Court, "[t]he function of the doctrine of promissory estoppel is . . . defensive in that it estops a promisor from denying the enforceability of the promise." *See Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) (citing Restatement (Second) of Contracts § 90 (1981)); *see also In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) ("we have long recognized . . . the defensive theory of promissory estoppel."). That is, promissory estoppel prevents a promisor who has induced substantial action or forebearance by another from denying that promise if "injustice can be avoided only by enforcement," *id.* (citing *Harkinson*, 944 S.W.2d at 636), but "it does not create a contract right that does not otherwise exist," *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981); *see Hruska v. First State*

---

an option contract). In unpublished opinions, this Court had upheld attorney's fee awards on promissory estoppel claims. *See Safe Env't v. Pelzel & Assocs., Inc.*, No. 03-09-00721-CV, 1999 Tex. App. LEXIS 7628 (Tex. App.—Austin 1999, no pet.) (mem. op.).

[23] CITGO disputes this conclusion, but maintains that if it must elect between the two theories, it would recover against MasTec/Wilde and C&S under promissory estoppel (including attorney's fees) and against Bechtel in negligence.

*Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988). Rather, it merely "prevents a party from insisting upon his strict legal rights"—i.e., the right to avoid his promise as not contractually binding—"when it would be unjust to allow him to enforce them." *In re Weekley Homes, L.P.*, 180 S.W.3d at 133 (quoting *Wheeler*, 398 S.W.2d at 96).

Although promissory estoppel may be the basis for an affirmative claim, *Wheeler*, 398 S.W.2d at 96, the supreme court has restricted the types of damages a promissory estoppel plaintiff can recover to "enforce" a promise: "the promisee is to be allowed to recover no more than reliance damages measured by the detriment sustained." *Wheeler*, 398 S.W.2d at 97. "Reliance damages, similar to out-of-pocket recovery, reimburse one for expenditures made toward the execution of the contract in order to restore the status quo before the contract." *Hart v. Moore*, 952 S.W.2d 90, 97 (Tex. App.—Amarillo 1997, pet. denied); *see* Restatement (Second) of Contracts § 349 (reliance damages "includ[e] expenditures made in preparation for performance or in performance, less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered had the contract been performed"); *see also Quigley v. Bennett*, 227 S.W.3d 51, 56 (Brister, J., concurring and dissenting) ("reliance damages" for fraud "compensate for the plaintiff's out-of-pocket expenditures"). In this way, reliance damages protect a promisee's "reliance interest" in a contract or promise, or his interest in being reimbursed for loss caused by reliance on the promise by being put in as good a position as he would have been had the contract not been formed or promise relied upon. Restatement (Second) of Contracts §§ 344, 349; *see Quigley*, 227 S.W.3d at 56 (Brister, J., concurring and dissenting); *O'Farrill Avila v. Gonzalez*, 974 S.W.2d 237, 247 (Tex. App.—San Antonio 1998, pet. denied).

Reliance damages are distinguished from expectancy or "benefit-of-the-bargain" damages, which serve to protect the promisee's "expectation interest," or his interest in having the benefit of his bargain by being put in as good a position as he would have been had the contract or promise been performed. Restatement (Second) of Contracts § 344. Consequently, expectancy damages like lost profits, for example, are not recoverable based on promissory estoppel. *See Sun Oil Co.*, 626 S.W.2d at 734 ("The damages recoverable by a party claiming estoppel are not measured by the profits that such party's reliance led him to expect, but instead are limited to the amount necessary to compensate that party for a loss already suffered."); *Fretz Constr. Co. v. Southern Nat'l Bank of Houston*, 626 S.W.2d 478, 483 (Tex. 1981) ("Damages recoverable in a case of promissory estoppel are not the profit that the promisee expected, but only the amount necessary to restore him to the position he would have been in had he not acted in reliance on the promise."). Similarly, consequential damages resulting from the failure to perform the promise are likewise not recoverable. *Id.* The limitation of promissory estoppel damages solely to reliance damages, rather than compensating for the loss of the full benefit of the breached or unperformed contract or promise, reflects the view that "[s]ince the promisee in such cases is partly responsible for his failure to bind the promisor to a legally sufficient contract, it is reasonable to conclude that all that is required to achieve justice is to put the promisee in the position he would have been in had he not acted in reliance upon the promise." *Wheeler*, 398 S.W.2d at 97.

As its promissory estoppel "reliance damages," CITGO obtained jury awards for its damages resulting from the pipeline rupture. Question 10 asked the jury to determine the sum of money that "would fairly and reasonably compensate CITGO for the damages incurred in the

past resulting from the detrimental reliance found in Question 9" (the promissory estoppel liability issue), including "the reasonable cost in Caldwell County, Texas to restore the CASA Pipeline to the condition it was in immediately before the occurrence" and "to respond to and remediate the spill." With the exception of the "Tulsa overhead" instruction, previously discussed, Question 10 paralleled the question on past negligence damages, and the jury awarded damages that differed only with respect to the "Tulsa overhead" amount. Similarly, Question 11 asked the jury to determine the sum of money that "would fairly and reasonably compensate CITGO for the damages which in reasonable probability will be incurred in the future resulting from the rupture of the CASA Pipeline found in Question 9." The jury awarded identical future damages for both negligence and promissory estoppel.

CITGO did not present evidence of "reliance damages" apart from the damages it attributes to the pipeline rupture. In CITGO's view, the pipeline rupture was "a direct result of its reliance on Clint Ferguson's statement that Appellants' crews would not be working near CITGO's pipeline that day" because it "acted in reliance on Clint Ferguson's promise and did not send out a representative to demand and supervise the uncovering of the pipeline prior to excavation." In turn, it contends that "[t]he environmental damages found by the jury were a direct result of the line rupture from responding to the emergency, repairing the line, remediation of the soil, bioremediation of the groundwater, testing and monitoring, to future monitoring and remediation to remove the contamination." We cannot agree that the damages from the pipeline rupture are reliance damages that CITGO can recover under its promissory estoppel theory.

47

CITGO's promissory estoppel damages theory is that it should recover its costs of repairing the pipeline and cleaning up the spill because (1) if Ferguson had kept his promise to give CITGO prior notice before it excavated near the CASA Pipeline, (2) CITGO would have sent a representative to the site, (3) who, in turn, would have located and uncovered the pipeline, and (4) ensured that any excavation on the site would not have ruptured the pipeline. CITGO's damages are not reimbursement for any amounts it expended in reliance on the promises, but compensation for consequential losses CITGO claimed it incurred when appellants failed to perform their promises. Such damages are in the nature of expectancy damages: they place CITGO in the position it claims it would have been had the promises been kept. Such damages are not recoverable through promissory estoppel. *See Sun Oil Co.*, 626 S.W.2d at 734; *Fretz Constr. Co.*, 626 S.W.2d at 483.

Because there was no evidence that CITGO incurred reliance damages that can support recovery under its promissory estoppel theory, we sustain appellants' thirteenth issue. Consequently, the district court erred in awarding CITGO attorney's fees. We do not reach and express no opinion regarding appellants' other challenges to the attorney's fees award.

## CONCLUSION

We reverse the portion of the district court's judgment awarding CITGO attorney's fees on its promissory estoppel theory and render judgment that CITGO take nothing on that theory. As for CITGO's negligence claim, we hold that the evidence is legally insufficient to support the jury's award of $1,159,194.75 in past damages, but there is sufficient evidence that CITGO incurred $871,413.99 in such damages—a difference of $287,780.76. In light of CITGO's remittitur of $287,780.76 in past negligence damages, we reform this portion of the district court's judgment

48

to award CITGO $871,413.99 in past negligence damages instead of $1,159,194.75. Similarly, as we have overruled appellants' challenges to the portions of the district court's judgment apportioning 80 percent responsibility to MasTec for CITGO's negligence damages and 10 percent responsibility to Bechtel, we reform the district court's judgment to award CITGO $697,131.19 in past negligence damages from MasTec rather than $927,355.80, and $87,141.40 in past negligence damages from Bechtel rather than $115,919.48. We likewise reform the district court's award of prejudgment interest on these amounts to award CITGO $178,081.64 from MasTec and $22,260.21 from Bechtel. As reformed, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Pemberton, Waldrop and Smith;
    (Justice B. A. Smith Not participating)

Reversed and Rendered in part; Reformed and, as Reformed,
Affirmed in part on Motion for Rehearing

Filed:   December 19, 2008