# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-07-00673-CV

Landmark Organization, L.P., Appellant

v.

Tremco Incorporated, Appellee

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 98TH JUDICIAL DISTRICT
NO. D-1-GN-05-000406, HONORABLE ORLINDA NARANJO, JUDGE PRESIDING

## M E M O R A N D U M  O P I N I O N

Landmark Organization, L.P., appeals a final summary judgment against it on claims it had asserted against Tremco Incorporated. In five issues, Landmark argues that the district court erred in granting Tremco summary judgment as to promissory-estoppel and implied-warranty claims Landmark had asserted and abused its discretion in excluding some of Landmark's summary-judgment evidence. We will affirm the district court's judgment.

## BACKGROUND

This appeal stems from disputes arising during the construction of the Hilton Austin building that is located next to the Austin Convention Center. In June 2001, Austin Convention Enterprises, Inc. (ACE), a corporation formed by the City of Austin to handle ownership of the project, entered into a "Design/Build" contract with appellant Landmark. Under the contract,

Landmark was to oversee and manage construction on ACE's behalf, including the hiring and supervision of all architects, engineers, and sub-contractors. Landmark hired Ellerbe Becket, Inc. as the architect for the project.

Part of Ellerbe's work entailed designing a water-proofing and water-removal system for a multi-level underground parking garage beneath the hotel building. Simply described, the system Ellerbe devised included several layers of water-penetration barriers in or around the garage walls working in concert with drains and pumps to remove water off-site. First, rough-hewn wood boards, known as "lagging," would be erected against the sides or walls of the excavated opening in which the garage would be built. A "drainage mat" would then be attached to the lagging, which would serve to capture any water penetrating gaps in the boards. The drainage mat would also carry any water it absorbed to a series of "weeps," PVC pipes lined with holes. The water would then travel through the pipes to sumps, and ultimately would be pumped off-site.

After the drainage mat was in place, an additional water-resistant barrier was to be installed over the drainage mat. Then, rebar would be erected over the barrier and "shotcrete" (a concrete-like material) would be sprayed over the rebar, and the shotcrete would be troweled smooth to form the walls of the garage. Finally, a slurry of fine particles would be pumped into any voids between the lagging and the surrounding earth.

At the recommendation of its waterproofing consultant, Robert (Zeke) Zdenek, Ellerbe specified that the water-resistant barrier to be installed over the drainage mat would be Paraseal, a water-proofing membrane manufactured by appellee Tremco. Paraseal consists of a high-density polyethylene sheet, one side of which is coated with a layer of bentonite, a naturally-occurring clay that expands when exposed to water. There was evidence that Landmark and perhaps

2

other parties involved with the project raised questions with Ellerbe regarding the choice of Paraseal, a bentonite product, versus a different type of membrane product manufactured by W.R. Grace. In September 2001, Ellerbe's project director wrote Landmark and explained that "After research of available products and in consultation with PSG [Zdenek's firm], our waterproofing consultant, our professional judgment led us to the selection of this material over the rubberized asphalt system offered by W.R. Grace. Key factors which we considered included 1) Number of past successful projects using the product; 2) Proven track record, i.e., years in existence; 3) Applicability to the specific conditions of this project; and 4) Coverage or limitations as expressed in the Warranty."

Landmark presented summary-judgment evidence that Tremco offered a five-year express warranty on Paraseal's waterproofing performance if installed according to certain Tremco specifications.[1] In his deposition, Zdenek, Ellerbe's waterproofing consultant, testified that he regarded this warranty as superior to that offered on the competing product because it covered both materials and labor to repair any leaks or other failures. As recommended by Zdenek and Ellerbe, the project proceeded with Paraseal being specified for use in waterproofing the underground garage.

The summary-judgment record reflects that a goal of Landmark and Ellerbe in regard to the garage waterproofing was ensuring that the Paraseal was installed in a manner that would ultimately satisfy Tremco's requirements for issuing its warranty. The construction specifications for the below-grade waterproofing included the following "Special Warranty" provision:

---

[1] Although the record is not entirely clear concerning the precise scope of this express warranty, any discrepancies in the evidence are not material to our analysis. In any event, Landmark does not assert that it is entitled to relief based upon a breach of express warranty claim.

Manufacturer/Contractor/Installer shall stand behind installed system for a period of five years from Date of Substantial Completion against [water infiltration]. When notified in writing from Owner, Manufacturer/Contractor/Installer shall promptly and without inconvenience and cost to Owner correct said deficiencies.

Effective October 11, 2001, Landmark entered into a subcontract with Alpha Insulation & Waterproofing, Inc., to install the Paraseal. The "Scope of Work" for Alpha under the contract included providing all equipment, labor, and materials necessary to "[i]nstall complete Paraseal waterproofing system by Tremco on all sub-grade vertical walls," "[p]rovide all materials, equipment and labor required for complete installation," and "[p]rovide complete waterproofing system to meet requirements for manufacturer's 10-year warranty."

Alpha's work installing the Paraseal waterproofing system began in October 2001 and continued through February of the following year. During this phase of the project, Rob Brath, a "District Manager" or sales representative for Tremco, visited the construction site approximately eight different times. During his deposition, Brath testified that his role was "[j]ust basically to see what's going on at the job site, how installation is going, and hopefully to address anything that may have come up that somebody may want to ask questions about," as well as volunteering guidance to installers if he noticed a problem with their work. Part of the purpose of his role, Brath explained, was to help head off problems in the installation of the sort that would cause Tremco ultimately to refuse to issue its warranty. Once work was completed and an owner or applicator applied for the Tremco warranty, Brath added, he would be consulted by Tremco's warranty personnel to determine

4

whether there were conditions or problems in the installation that should prevent Tremco from issuing its warranty.[2]

In November or December, D-7, a company that served as a waterproofing consultant to Levien-Rich, one of ACE's consultants on the project, prepared a report raising a number of concerns with the ongoing installation of the garage's waterproofing system. These concerns included the possible premature activation of Paraseal's bentonite component by rainwater, poor installation or damage to the Paraseal, and gaps in the lagging of dimensions that compromised it as "proper backing for this type of bentonite system." The report elaborated that "[t]he gaps are larger than 1" and in most cases are greater than 2"-3"," and stated, "The specifications and manufacturer require any opening over 1" to be covered or filled." Levien-Rich forwarded excerpts from this report, along with photographs D-7 had taken, to Landmark, with the following comments:

Based on [D-7's] observation, their conclusions were that:

1) Certain elements of the installation are poor and that, if not addressed, the waterproofing system will not perform as intended.

2) The manufacturer's representative should be contacted to review the conditions noted in the report and the photographs. The manufacturer providing the warrant[y] and the Designer's consultants should also review the report and photographs.

3) Prior to covering any area with Shotcrete, the manufacturer should provide written acceptance of the area.

---

[2] Brath testified that his understanding of the warranty was that it would cover the cost of the material and, in the event of a failure, "the replacement up to the dollar value of the material to the owner."

In the aftermath of this letter, Landmark and Alpha undertook various efforts to address D-7's concerns. Tremco's Brath was consulted in connection with these efforts and, on January 15, 2002, Brath met at the job site with representatives from Landmark and Alpha, as well as Zdenek, Ellerbe's waterproofing consultant. On January 18, Brath wrote Alpha stating the following:

> On January 15, 2002, Alpha, Landmark, Robert Zdenek and Myself me[t] to address the concerns [of] the consultant D7. I understand their concerns and can assure all parties that each item is being addressed. Tremco's recommendation is any gap greater than 3 inches, not 1 inch, needs to be filled or covered. Tremco allows gaps up to 3 inches in the lagging, when Tremdrain [another Tremco product being used on the project] and Paraseal are used together. All voids over 3 inches are being spanned with plywood. All penetrations are being detailed per Tremco's recommendations.
>
> After walking the job site again on January 15, 2002, and reviewing the necessary details for this job, I see no issues that would affect the warranty that Tremco will issue upon completion of the installation.

On January 24, Ellerbe's project director wrote Landmark and indicated that, based on Brath's letter, Ellerbe would be amending its construction specifications in accord with Brath's statements regarding the size of permissible gaps in the lagging:

> After reviewing Mr. Robert Brath's letter dated January 18, 2002 in which he states that Tremco will accept gaps up to 3 inches without filling or covering and that this condition will not jeopardize any warranties related to their product, Ellerbe Becket can amend specification Section 7130 to align with his statement. Please note that the original requirement for filling any gaps greater than 1 inch came from the Tremco's technical specification. Mr. Brath will be requesting a letter from Tremco's Technical Services Division also addressing this question.

Enclosed with the letter, along with a copy of Brath's letter, was a copy of revised construction specifications for "Section 7130" ("Below-Grade Waterproofing") reflecting "Revised Construction

6

Issue No. 3 (Revision 1), dated 1/24/02." In Part 3 of the document ("Execution"), section 3.2 ("Preparation"), is reflected, "Revision Note: Revised lagging gap preparation per CI-3 Revision 1," after which is the following, in boldface type that contrasts with the text in the rest of the document:

**A.     Surface Preparation:**

**1.     All tie holes and gaps or protrusions in the wood lagging surface to receive sheet waterproofing directly applied to the lagging sheet shall not be greater than one inch and shall be filled or covered as required by waterproofing manufacturer.**

**2.     All gaps in the wood lagging surface to receive drainage mat directly applied to the lagging as a substrate for the sheet waterproofing shall not be greater than three inches and shall be filled or covered as required by waterproofing manufacturer.**

Installation of the Paraseal was ultimately completed by the end of February 2002. In early March, Brath visited the project site and testified as to his observations: "At that point in time, it was obvious that there was an issue with the building itself . . . a failure in the system per se," as there was water coming through the walls. Thereafter, Landmark, Alpha, and others pursued various corrective measures in an attempt to remedy the problems.

Alpha eventually requested that Tremco issue an express performance warranty. After consulting with Jason Muse, who had since replaced Brath as Tremco's contact on the Hilton project, Tremco declined to provide any other warranties other than the one described in the product data sheet provided to Landmark prior to the start of the project. In a letter dated February 6, 2004, Tremco explained that "[w]e have been advised that there are several potential problems related to the manner in which our Paraseal membrane was used and installed on this project including, but not limited to, abuse by contractors (which was apparently due in part

7

to improper coordination of trades on the job) and a failure to properly protect and detail the termination edge of the membrane. It is also our understanding that there were numerous other errors in the completion of this project that have the potential to adversely affect our membrane, including an insufficient drainage system." "Under these circumstances," the letter explained, "Tremco is not in a position to issue any additional warranties regarding our Paraseal membrane." Consequently, "[t]he only warranty in effect from Tremco in connection with this project is the one set forth in our product data sheet, which was provided prior to the start of the project."

In 2005, Landmark sued Ellerbe, Alpha (and Alpha's surety, Hartford Fire Insurance Co.), and Tremco. Against Tremco, Landmark asserted causes of action for negligence, breach of implied warranties of merchantability and fitness for a particular purpose, and promissory estoppel. Landmark's promissory-estoppel claim sought to enforce what it asserted was Tremco's promise to issue its express performance warranty at the conclusion of the project. Alpha also asserted cross-claims against Tremco for allegedly supplying it with a defective product.

Tremco filed traditional and no-evidence summary-judgment motions. In one motion, Tremco challenged Landmark's promissory-estoppel claim, arguing that there was no evidence that (1) Tremco made any promise to Landmark; (2) Landmark reasonably and substantially relied on any such promise to its detriment; (3) Landmark's reliance was foreseeable to Tremco; (4) injustice could only be avoided by enforcing the alleged promise; or (5) Landmark incurred any damages arising from the alleged promise. In its other motion, Tremco challenged Landmark's warranty and negligence claims. Among other grounds, Tremco asserted that (1) because ACE owned the parking garage, Landmark lacked standing to assert the claims; (2) Landmark was not in privity with Tremco; (3) Tremco had disclaimed any implied warranties; (4) Landmark had

8

no evidence that the Paraseal used was defective or not reasonably fit; and (5) the economic-loss rule barred Landmark's negligence claim. Landmark filed a response to each motion. Tremco subsequently objected to some of Landmark's summary-judgment evidence, including portions of an affidavit prepared by Landmark representative Lisa Houston, which Landmark presented in opposition to both summary-judgment motions.

Following separate hearings on the two summary-judgment motions, the district court, in a single order, granted both motions without specifying its grounds and excluded portions of Ms. Houston's affidavit.[3] On the same day, Alpha non-suited its cross-claims against Tremco. Thereafter, Landmark settled its claims against Ellerbe and proceeded to trial against Alpha and Hartford, eventually securing a jury award of over $400,000 in damages. The district court rendered final judgment on the verdict, which it later modified.[4]

Thereafter, Landmark appealed the summary-judgment order, while Alpha appealed the adverse judgment on Landmark's claims against it. Ultimately, Landmark and Allied settled, the district court vacated its prior judgment and rendered a judgment of dismissal to effectuate the settlement,[5] and we dismissed Allied's appeal.

---

[3] The Honorable Margaret Cooper heard both summary-judgment motions and the evidentiary objections, and issued a letter informing the parties that she was granting both motions and sustaining some of Tremco's evidentiary objections. However, it was the Honorable Stephen Yelenosky who ultimately signed the above-mentioned order.

[4] This judgment was signed by the Honorable Orlinda Naranjo. Because she signed the judgments making Judge Yelenosky's summary-judgment order final, she is identified in our caption as "Judge Presiding."

[5] Judge Naranjo also signed this order and judgment. She further signed an order memorializing that Alpha's non-suit of its cross-claim against Tremco, combined with the prior summary-judgment order on Landmark's claims against Tremco, constituted a final disposition of all claims against Tremco.

9

Landmark brings five issues on appeal. In its first issue, Landmark argues that it presented sufficient summary-judgment evidence to raise a genuine issue of material fact as to each element of its promissory-estoppel claim. In its second and third issues, Landmark argues that summary judgment on its implied-warranty claims was improper because (1) certain provisions of the Design/Build contract gave it standing to assert those claims, (2) it raised a genuine issue of material fact on each element of those claims, and (3) Tremco failed to conclusively establish its affirmative defense of disclaimer as a matter of law. Further, although it does not challenge the district court's summary judgment as to its negligence claim, Landmark argues in its fourth issue that if the economic loss rule bars its negligence claim, it follows that Landmark must have a cause of action for breach of implied warranty. In its fifth issue, Landmark contends that the district court abused its discretion in excluding portions of Lisa Houston's affidavit.

**Standard of review**

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When reviewing a summary judgment, we take as true all evidence favorable to the non-movant, and we indulge every reasonable inference and resolve any doubts in the non-movant's favor. *Valence Operating Co.*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215. Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c). A defendant who conclusively negates at least one of the essential elements of each of the plaintiff's causes of action

or who conclusively establishes all of the elements of an affirmative defense is entitled to summary judgment. *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex. 1995).

A no-evidence motion for summary judgment must be granted if, after an adequate time for discovery, (1) the moving party asserts that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial, and (2) the non-movant fails to produce more than a scintilla of summary-judgment evidence raising a genuine issue of material fact on those elements. Tex. R. Civ. P. 166a(i). A no-evidence summary judgment is essentially a directed verdict granted before trial, to which we apply a legal-sufficiency standard of review. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750-51 (Tex. 2003); *Perdue v. Patten Corp.*, 142 S.W.3d 596, 603 (Tex. App.—Austin 2004, no pet.). A no-evidence summary judgment will be sustained when: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a scintilla; or (4) the evidence conclusively establishes the opposite of a vital fact. *King Ranch*, 118 S.W.3d at 751. More than a scintilla of supporting evidence exists if the evidence would allow reasonable and fair-minded people to differ in their conclusions. *Id*. "Less than a scintilla of evidence exists when the evidence is 'so weak as to do no more than create a mere surmise or suspicion' of a fact." *Id*. (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

If the trial court does not specify the ground or grounds on which it relied in granting summary judgment, we must affirm if any of the grounds presented in the motion were meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993); *Knott*, 128 S.W.3d at 216.

11

**Promissory estoppel**

In its first issue, Landmark asserts that the district court erred in granting summary judgment as to its promissory-estoppel claim because a fact issue exists as to each of the claim's elements. Promissory estoppel is a legal doctrine that may permit enforcement of a promise that is unenforceable as a matter of contract law. The doctrine "does not create a contract right that does not otherwise exist," *Sun Oil Co. (Delaware) v. Madeley*, 626 S.W.2d 726, 734 (Tex. 1981); *see Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 785 (Tex. 1988), but instead "prevents a party from insisting upon his strict legal rights"—i.e., the right to avoid his promise as not contractually binding—"when it would be unjust to allow him to enforce them." *In re Weekley Homes, L.P.*, 180 S.W.3d 127, 133 (Tex. 2005) (quoting *Wheeler v. White*, 398 S.W.2d 93, 96 (Tex. 1965) (citing Restatement (Second) of Contracts § 90 (1981))). Promissory estoppel is thus "defensive" in nature. *Wheeler*, 398 S.W.2d at 96. The doctrine's underlying rationale, as the supreme court explained in *Wheeler*, is "where one party has by his words or conduct made to the other a promise of assurance which was intended to affect the legal relations between them and to be acted on accordingly, then, once the other party has taken him at his word and acted on it, the party who gave the promise cannot afterward be allowed to revert to the previous relationship as if no such promise had been made." *Id.* The elements of promissory estoppel are: (1) a promise; (2) foreseeability of reliance by the promisor; (3) actual, substantial and reasonable reliance by the promisee to its detriment; and (4) injustice can be avoided only by enforcement of the promise. *In re Weekley Homes, L.P.*, 180 S.W.3d at 133.

In this case, Landmark attempts to invoke promissory estoppel to enforce what it characterizes as a promise by Tremco to issue its express performance warranty once installation of

the Paraseal was complete.[6]  As evidence of this asserted promise, Landmark has relied primarily

on Brath's letter of January 18, 2002, regarding the concerns raised by D-7, especially the last

portion of the concluding paragraph:  "After walking the job site again on January 15, 2002, and

reviewing the necessary details for this job, *I see no issues that would affect the warranty that*

*Tremco will issue upon completion of the installation*."  In Landmark's view, Brath's statement is

a promise that "all concerns have been addressed and <u>all</u> parties, including Landmark, can be assured

that upon completion of the installation of the Tremco products, Tremco 'will issue' the warranty"

and that it was reasonably foreseeable to Tremco that Landmark would rely on this statement as a

promise that a warranty would issue.  We disagree.

To be enforceable through promissory estoppel, the asserted "promise" must

be sufficiently specific and definite that it would be reasonable and justified for the promisee to

rely upon it as a commitment to future action.  *See Alpha Vista, Inc. v. Holt*, 987 S.W.2d 138, 141-

42 (Tex. App.—Houston [14th Dist.] 1999, pet. denied); *Gilmartin v. KVTV-Channel 13*,

985 S.W.2d 553, 558-59 (Tex. App.—San Antonio 1998, no pet.).  "A promise must also be

more than speculation of future events, a statement of hope, an expression of opinion, an

---

[6]  Based on this theory, Tremco seeks to recover over $2 million in damages it attributes to the fact that Tremco ultimately did not issue an express performance warranty, including "the cost to remedy or correct materials or construction defects, the cost of change orders to other subcontractors because of materials or construction defects, and costs associated with construction delays resulting from materials or construction defects" that, in Landmark's view, it would have avoided and/or Tremco would have absorbed had the warranty been issued.  As the question was not presented as a ground in Tremco's summary-judgment motion, we express no opinion as to whether these sorts of damages are recoverable under a promissory-estoppel theory.  *See Bechtel Corp. v. CITGO Prods. Pipeline Co.*, 271 S.W.3d 898, 926-28 (Tex. App.—Austin 2008, no pet.) (distinguishing reliance damages, which are recoverable under a promissory-estoppel theory, from expectancy damages, which are not).

expectation, or an assumption." *Esty v. Beal Bank S.S.B.*, 298 S.W.3d 280, 305 (Tex. App.—Dallas 2009, no pet.) (citing *City of Beaumont v. Excavators & Constructors, Inc.*, 870 S.W.2d 123, 138 (Tex. App.—Beaumont 1993, writ denied)).

On its face, Brath's letter is addressed to specific concerns raised by D-7 in November or December 2001—most prominently, the issue regarding the 3-inch versus 1-inch gaps in the lagging. He speaks from the standpoint of "walking the job site again on January 15, 2002, and reviewing the necessary details for this job." At that time, the evidence is undisputed, installation of the Paraseal was over a month from completion. At that juncture, Brath offers only the following: "I see no issues that would affect the warranty that Tremco will issue upon completion of the installation." Furthermore, there was undisputed evidence that Tremco would issue such a warranty only after the owner or applicator had submitted a written request to the company's warranty department and the department determined, at that time, whether there were issues that would preclude the warranty's issuance.

Viewing the evidence in the light most favorable to Landmark, Brath states only that, based on his observations of the current state of installation, he saw no problems that would prevent issuance of Tremco's warranty. It was undisputed that his statement was based on his own observations of the work that had been completed at that juncture and the information available to him at that time. There was much installation of Paraseal yet to be completed. Under such undisputed circumstances, a reasonable fact finder could only conclude that the statement in the letter was an "expression of opinion" or "an expectation." *See Esty*, 298 S.W.3d at 305. We further conclude that the statement was not sufficiently specific and definite to support a promissory estoppel claim. Any reliance by Landmark on Brath's statement as an unconditional promise that

14

Tremco would ultimately issue a performance warranty after the remaining work was completed would not have been reasonable or justified as a matter of law. *See Alpha Vista, Inc.*, 987 S.W.2d at 141-42; *Gilmartin*, 985 S.W.2d at 558-59; *City of Beaumont*, 870 S.W.2d at 138. To hold otherwise, as Tremco suggests, would require Tremco to issue such a warranty regardless of whether "Alpha could have installed Tremco's product upside down and backwards, and other trades could have subjected it to abuse through project completion."

In reply, Landmark urges that "there is no evidence whatsoever that anything changed, any condition arose, or any reason developed for Tremco not to thereafter issue a warranty, *save and except the failure of the Tremco Paraseal product*." Thus, it reasons, to the extent Brath's letter contemplates that the warranty might not issue because of intervening future developments, that fact "is totally irrelevant because no condition ever arose that would cause the promise in the letter to be revoked." This characterization of the summary-judgment evidence, even if supported by the record, does not change our analysis. While Landmark's argument might be relevant to whether Tremco *breached* what Landmark views as Tremco's "promise" to issue the warranty, it remains that the "promise" was insufficiently definite and specific to be enforceable through promissory estoppel in the first place.

Landmark also urges that Tremco made "multiple promises to provide a warranty" prior to Brath's letter. In support, it points to the "Special Warranty" provision of Ellerbe's construction specifications, the requirement in Alpha's subcontract with Landmark requiring it "[p]rovide complete waterproofing system to meet requirements for manufacturer's 10-year warranty," and Brath's acknowledgments during his deposition that Tremco was being asked

15

to provide its warranty and that part of his job was to work with installers so they could qualify for it. We cannot conclude that any of this evidence raises a fact issue that Tremco made a promise to issue an express performance warranty that could be enforced by promissory estoppel.

We overrule Landmark's first issue.

## Implied warranties

In its second and third issues, Landmark argues that the district court erred in granting summary judgment as to its implied-warranty causes of action. Landmark contends that it had standing to assert these claims, that it raised a fact issue as to each element of these claims, and that Tremco failed to conclusively establish its disclaimer defense. In its fourth issue, Landmark urges that assuming the economic loss rule barred Landmark's negligence claims (which it does not dispute), Landmark must have a cause of action for breach of implied warranties. Our disposition of Landmark's contentions regarding Tremco's disclaimer defense is dispositive.

An implied warranty of merchantability and fitness for a particular purpose may arise in a contract for the sale of goods unless expressly excluded or modified by conspicuous language. *See* Tex. Bus. & Com. Code Ann. §§ 2.314 (merchantability), 2.315 (fitness for a particular purpose), 2.316 (exclusion provision) (West 1994); *Cate v. Dover Corp.*, 790 S.W.2d 559, 561-62 (Tex. 1990). The evidence conclusively showed that, as part of the submittal process, Tremco provided Alpha, and Alpha provided Landmark, product data sheets for the Paraseal Alpha

16

purchased for use on the project.[7]  Each of the product data sheets contained a section titled

"**Warranty**," with text substantively identical to the following:

> Tremco warrants its Paraseal Membranes to be free of defects in materials, but makes no warranty as to appearance or color.  Since methods of application and on site conditions can affect performance, Tremco makes no other warranty, expressed or implied, including warranties of MERCHANTABILITY and FITNESS FOR A PARTICULAR PURPOSE, with respect to Paraseal Membranes.  Tremco's sole obligation shall be, at its option, to replace or to refund the purchase price of the quantity of Paraseal membrane proved to be defective and Tremco shall not be liable for any loss or damage including incidental or consequential damages arising from the use of Paraseal Membranes.

As Landmark emphasizes, it "paid for the Paraseal through its payments to Alpha, which explicitly included the cost of the Tremco materials" in its invoices.

In attempting to avoid this disclaimer, Landmark suggests that the "Warranty" statements on the product-data sheets, including the disclaimers, did not in themselves have any effect, but merely referred to the express performance warranty that Tremco never issued. Consequently, Landmark reasons, "Tremco cannot now properly rely on disclaimers that *would have* been included in the express warranty while at this same time admitting that no such warranty exists." (emphasis in original).  Similarly, Landmark urges that Tremco's product data sheets were merely "informational material" and "not a contract."  We disagree with Landmark's assessment of the legal effect of the product data sheets' warranty and disclaimers. *See PPG Indus. v. JMB/Houston Ctrs. Ltd. P'ship*, 146 S.W.3d 79, 100 (Tex. 2004) (advertisement containing

---

[7] The evidence showed that Landmark received the product data sheets from Alpha and "approved" them on October 12, 2001, one day after entering into the subcontract with Alpha to install the Paraseal.

17

express warranty printed in trade magazine could be basis of express warranty claim); *Cate*, 790 S.W.2d at 560 (analyzing express warranty and disclaimer of implied warranties appearing in product advertisement); *Appleby v. Hendrix*, 673 S.W.2d 295, 297 (Tex. App.—Beaumont 1984, no writ) ("We find and hold that the solicitation and the advertisement . . . were an express warranty.").

Furthermore, contrary to Landmark's premise that the product data sheet warranty and disclaimers are somehow tied to the express performance warranty that is the subject of Landmark's promissory-estoppel claim, the summary-judgment record conclusively showed that the former express warranty was distinct from the latter. In contrast to the product data sheet warranty, which is explicitly limited to "defects in materials" and confines Tremco's obligation to replacing or refunding the purchase price of any Paraseal proved to be defective, Landmark depicted the un-issued express warranty as a product and performance warranty issued after installation that would cover both materials and labor to repair any leaks or failures. Moreover, when denying Alpha's request that it issue the broader warranty after installation was completed, Tremco distinguished between the two express warranties: "Tremco is not in a position to issue any *additional* warranties regarding our Paraseal membrane. The only warranty in effect from Tremco in connection with this project is the one set forth in our product data sheet, which was provided prior to the start of the project." (Emphasis added). Landmark refers us to no contrary evidence that these warranties were somehow one and the same.

Landmark also argues that the disclaimers are not effective as to it because Tremco provided the product data sheets directly to Alpha and not Landmark. It reasons that "even if Tremco could rely on the disclaimers in the Data Sheet warranty, it could only rely on them if it

18

was Alpha claiming the breach." At the same time, however, Landmark argues that it can enforce implied warranties on Tremco's product because it is in vertical privity with Alpha. In *Hou-Tex, Inc. v. Landmark Graphics*, the Fourteenth Court of Appeals rejected a similar attempt by a party to assert claims predicated on privity with the defendant while disclaiming when it came to enforcing contractual provisions:

> Hou-Tex uses its remoteness from the original sales transaction as both a sword and a shield: it asserts its ability to sue, but uses its distance from the sales transaction to deny Landmark its UCC protections. Hou-Tex cannot have it both ways. If a third party can sue a seller . . . the seller's disclaimers of warranties apply to the third party.

26 S.W.3d 103, 111-12 (Tex. App.—Houston [14th Dist.] 2000, no pet.). The same principle applies here: if any implied warranty runs to Landmark's benefit, any effective disclaimer of that warranty must also run to counter it. *See Welwood v. Cypress Creek Estates, Inc.*, 205 S.W.3d 722, 728 (Tex. App.—Dallas 2006, no pet.) ("remote purchasers . . . may not rely on the absence of privity to bring causes of action against a remote seller and at the same time assert that privity is required for the seller to rely on contractual disclaimers").

Finally, we must briefly address Landmark's assertion that if its negligence claim is barred by the economic loss rule, it must have a viable implied-warranty claim. Landmark presents no authority, and we find none, for the proposition that if a claim is barred by the economic loss rule, it follows that the claimant must have a valid UCC implied-warranty claim. Among other things, Landmark overlooks the potential implications of warranty disclaimers like those here.

We overrule Landmark's second, third, and fourth issues.

**Evidentiary rulings**

In its fifth issue, Landmark argues that the district court abused its discretion in excluding portions of Lisa Houston's affidavit. We review a trial court's ruling admitting or excluding evidence for abuse of discretion. *State v. Bristol Hotel Asset Co.*, 65 S.W.3d 638, 647 (Tex. 2001). A trial court abuses its discretion when it rules on the admissibility of evidence in an arbitrary or unreasonable manner or without reference to guiding rules or principles. *Carpenter v. Cimarron Hydrocarbons Corp.*, 98 S.W.3d 682, 687 (Tex. 2002). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998); *Taylor v. Texas Dep't of Protective & Regulatory Servs.*, 160 S.W.3d 641, 650 (Tex. App.—Austin 2005, pet. denied). Additionally, we will not reverse a trial court for an erroneous evidentiary ruling unless the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. *See* Tex. R. App. P. 44.1; *see also Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989). To show such harm from an evidentiary ruling, the complaining party usually must demonstrate that the judgment turns on the particular evidence excluded or admitted. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753-54 (Tex. 1995).

The district court excluded the following statements from Houston's affidavit:

- After testifying that Landmark had executed a subcontract with Alpha and authenticating an attached copy of the contract, Houston added, "*Alpha, in turn, negotiated with Tremco to provide the Paraseal product that would be installed as part of the waterproofing system.*" The district court sustained Tremco's objections to the latter statement on the bases of hearsay and lack of personal knowledge.

20

- Houston stated that "*Landmark . . . was told that a five-year express warranty that the Paraseal would perform for this application would be issued.*" The district court sustained Tremco's hearsay objection to his statement.

- Houston testified that "*Landmark relied on the promise that Tremco would issue an express warranty that the Paraseal would perform for this application.*" The district court sustained Tremco's objections based on hearsay and lack of personal knowledge.

- Houston averred that "[t]he garage waterproofing system *was defective* and leaked." The district court sustained Tremco's objection that "was defective" was "conclusory" and lacked foundation.

We find no abuse of discretion in the district court's exclusion of this evidence.

Affidavits must be based on personal knowledge in order to be competent summary judgment evidence of the facts stated therein. Tex. R. Civ. P. 166a(f); *Trostle v. Combs*, 104 S.W.3d 206, 214 (Tex. App.—Austin 2003, no pet.). Merely reciting that the affidavit is made on personal knowledge is insufficient. *Humphreys v. Caldwell*, 888 S.W.2d 469, 470 (Tex. 1994); *Radio Station KSCS v. Jennings*, 750 S.W.2d 760, 761-62 (Tex. 1988). The affiant must disclose the basis upon which he has personal knowledge of the facts asserted. *Id*.

Houston averred that she was "capable of making [each] affidavit on behalf of Landmark Organization, L.P., which is personally acquainted with the facts herein stated, which are all true and correct." However, she never explained how *she* acquired personal knowledge concerning the above facts, or how she would have through her role with Landmark. While Houston did state that "I am the current Secretary of the General Partner for Landmark," she did not elaborate as to how she would have acquired personal knowledge of the facts in this role. Among other things, she never explains how serving as "the *current* Secretary of the General Partner of Landmark" as of

21

the date she signed her affidavit—September 20, 2007—would afford her personal knowledge of events that occurred in 2001 and 2002. Likewise, the district court did not abuse its discretion in excluding as hearsay Houston's statements regarding facts that, especially given her lack of personal knowledge, she necessarily would have acquired from third parties. Nor did the district court abuse its discretion in excluding Houston's characterization of the "garage waterproofing system" as "defective" as an unsupported conclusion.

We overrule Landmark's fifth issue.

## CONCLUSION

Having overruled all of Landmark's issues on appeal, we affirm the district court's judgment.

_____

Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed

Filed:   June 30, 2010